[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 3, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-13718

_____

D. C. Docket No. 06-20057-CR-PCH

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RONALD DELANCY,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(October 3, 2007)**

Before DUBINA and MARCUS, Circuit Judges, and PROCTOR,[*] District Judge.

_____

[*] Honorable R. David Proctor, United States District Judge for the Northern District of Alabama, sitting by designation.

MARCUS, Circuit Judge:

Defendant Ronald Delancy ("Delancy") challenges the district court's denial of his motion to suppress the drugs, weapons, and cash found when police searched a home rented by his girlfriend, LaSandra Godfrey ("Godfrey"). The police did not have a warrant, and they entered the home to conduct a "protective sweep" -- a "quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." Maryland v. Buie, 494 U.S. 325, 327 (1990). The district court held both that the protective sweep was lawful and that Godfrey had knowingly and voluntarily consented to the search of her home. Delancy then entered a conditional guilty plea, pursuant to Fed. R. Crim. P. 11(a)(2), reserving the right to appeal the Fourth Amendment issues he raised.

We need not and do not address the legality of the protective sweep. Even if we assume that the protective sweep was unlawful, the district court properly denied Delancy's motion to suppress the evidence because Godfrey voluntarily consented to the search of her home and her consent was not tainted by the sweep. Accordingly, we affirm.

2

# I. BACKGROUND

## A.    Procedure

On January 26, 2006, a federal grand jury returned an indictment charging Ronald Delancy with five counts of narcotics and firearm violations. Count 1 charged possession with intent to distribute 50 grams or more of crack, in violation of 21 U.S.C. § 841(b)(1)(A)(iii); Count 2 charged possession with intent to distribute 100 or more grams of cocaine, in violation of 21 U.S.C. § 841(b)(1)(B)(ii); and Count 3 charged possession with intent to distribute marijuana, in violation of 21 U.S.C. § 841(b)(1)(D). The last two counts were the gun charges -- possession of a firearm in relation to drug trafficking, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count 4), and felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) (Count 5).

Delancy moved to suppress the evidence police found in the home -- including crack and powder cocaine, a fully loaded AK-47 assault rifle, two boxes of ammunition, marijuana, tens of thousands of dollars in cash, and other evidence of drug trafficking -- arguing that the police obtained it in violation of the Fourth Amendment. On March 20, after hearing several days of testimony and oral argument, the district court denied Delancy's motion in a detailed and thorough ruling entered from the bench. (The following day, the court entered a written

order denying the motion for the reasons given during the hearing.) The district court determined that the protective sweep was valid, that Godfrey and Delancy both voluntarily consented to the search, and that Delancy lacked standing to pursue any Fourth Amendment challenges to the search of the house.[1] After the district court denied his suppression motion, Delancy entered a conditional guilty plea to Counts 1, 3, 4, and 5, reserving (and presently exercising) the right to appeal the district court's Fourth Amendment rulings under Rule 11(a)(2) of the Federal Rules of Criminal Procedure.[2]

## B.    Facts

On the morning of December 1, 2005, a task force of federal and state law enforcement officers approached the home of LaSandra Godfrey at 1028 Northwest 53rd Street in Miami, Florida. The officers were looking to question Delancy, Godfrey's boyfriend, in connection with some unsolved crimes, including several homicides relating to drug trafficking, in the Overtown neighborhood of

---

[1] The government argued that Delancy lacked standing to challenge any of the contraband or evidence seized from the house because he disclaimed any privacy interest in the home when he told officers that he "stayed" at the house but did not live there. Although the district court accepted this argument, the government concedes on appeal that Delancy had standing.

[2] This rule provides that, "[w]ith the consent of the court and the government, a defendant may enter a conditional plea of guilty or nolo contendere, reserving in writing the right to have an appellate court review an adverse determination of a specified pretrial motion. A defendant who prevails on appeal may then withdraw the plea." Fed. R. Crim. P. 11(a)(2).

Miami. Delancy was one of a number of individuals sought as material witnesses in connection with the task force investigation. After several unsuccessful efforts, the officers focused on Godfrey's address because Delancy had two vehicles registered there. The officers did not have an arrest warrant for Delancy, nor did they have probable cause to believe Delancy had committed a crime, nor, finally, did they have probable cause or a warrant to search the home for guns, drugs, or money.

The officers had received a briefing on Delancy earlier that morning. At the briefing, the district court found, the officers were informed that Delancy was a "dangerous person," and that the officers "should be on high alert with regard to their safety." R. 65 at 7. The officers were specifically informed that Delancy had a history of arrests for narcotics and other offenses, and several narcotics convictions. The officers were also told that homicide detectives wanted to speak with Delancy in connection with their investigation into a drug ring purportedly responsible for shootings in the Overtown area and other inner city neighborhoods.

As the officers approached with their weapons drawn, the door to the small house was opened and then immediately shut again. Before the door closed, one of the officers saw Delancy hiding something in the arm of a couch positioned near

5

the door. Moments later, the door opened again, and a woman exited the house.[3]

Delancy followed, and the officers handcuffed him and took him into custody outside the home. Several of the officers then entered the home to conduct a "protective sweep" -- a limited search of the home for any individuals who might pose a danger to the officers.

During the sweep, several officers encountered Godfrey and her two young children (an infant and a toddler) near or inside the rear bedroom of the house. These officers were in the bedroom with Godfrey for ten to twenty minutes. One of the officers, Detective Mercado, spoke with Godfrey about the situation while another, Agent Leahy, observed. Leahy was also watching Godfrey's children, trying to make sure the infant did not roll off the bed. During this time, Godfrey also called several relatives to arrange for them to pick up the children.

The officers asked Godfrey if she would consent to a search of the home. Godfrey gave spoken consent to the search, and she also signed a written consent form containing the following text:

> I understand that I have a right to refuse to give my consent to a search and may demand that a search warrant be obtained prior to any

---

[3] The woman, Tabitha Henderson, told the police that she had arrived at the house just a few minutes earlier. One of the officers confirmed this fact by observing that the ice in a fast-food cup in her car had not yet melted. At the suppression hearing, she testified that she had come to the house to pick up Godfrey's three year old son to take him to school. Henderson was not charged with any crime.

search of the person or property described below.

I understand that any contraband or evidence of a crime found during the search can be seized and used against me in any court of law or other proceeding.

I understand that I may consult with an attorney before or during the search.

I understand that I may withdraw my consent to this search at any time prior to the search's termination.

This consent to search has been given voluntarily without promises, threats, coercion or force of any kind whatsoever.

I have read the above statement of rights, understand these rights, and hereby authorize agents of the Bureau of Alcohol, Tobacco and Firearms to conduct a complete search of the property described below.

The form contains Godfrey's signature and is dated the day of the search.

The prosecution and the defense presented sharply differing accounts of both the sweep and the consent. Delancy claimed that the sweep was overbroad -- that it was too long, too intrusive, and really amounted to a "subterfuge" to give the authorities reason to justify a full-scale search of the home without a warrant or even probable cause. He presented testimony from Godfrey, who said that she could hear the officers walking around in the house while she was speaking with the officers in the back bedroom, and that this occurred after the initial protective sweep had ended. She said that she was sure that they were in the kitchen because

some of the tiles on the kitchen floor were broken and made an irritating noise when someone stepped on them. R. 63 at 11. Godfrey also testified that one of the officers lifted her mattress.

Delancy claims that Godfrey did not voluntarily consent to a search of the home. During the suppression hearing, Godfrey testified that one of the officers held a rifle pointed towards her and her children, and that she "felt like a hostage. I felt like I was going to jail." R. 63 at 6–8. According to Godfrey, another officer told her that the Department of Children and Families would take away her children if she did not allow the police to search the house. R. 63 at 9–10. She also said that one of the officers got on his radio as if to call the Department of Children and Families, and she claimed that one of the officers said, "[W]hat's more important[,] your children or you going to jail?" R. 63 at 9.

The officers gave a different account of the sweep and the consent. They testified that the protective sweep was conducted quickly and unobtrusively, and that its only purpose was to make sure that there was no one inside the house who would present a danger to the officers. Cristin Rios of the City of Miami Police Department said that several officers entered the home to perform the sweep, but that all of the officers (except those speaking with Godfrey) left within a minute or two of the entry. R. 62 at 102–03. Notably, Agent Frankhauser of the Drug

8

Enforcement Agency ("DEA") testified that the contraband found in the kitchen of the home -- drugs and cash in the oven, a semi-automatic AK-47 rifle and more drugs in the utility closet -- were all found <u>after</u> Godfrey consented to the search, not during the sweep. R. 62 at 70–72.

As for Godfrey's consent, Detective Mercado of the City of Miami Police Department testified that he did discuss Godfrey's children with her. He said that he "asked if there is anyone she can call to take care of the kids while we spoke about what was going on in the apartment." R. 62 at 11. According to Mercado, Godfrey said that she could call a relative to pick them up, which she did. Godfrey's aunt and grandmother picked up the children a short time later. R. 63 at 12. Agent Leahy of the Bureau of Alcohol, Tobacco, and Firearms was also in the bedroom with Godfrey. He testified that he was trying to help out with the kids while Godfrey spoke with Mercado. R. 62 at 55.

Both officers testified that the tone of Mercado's conversation with Godfrey was conversational, not threatening. Mercado testified that Godfrey was "nervous but she was able to speak to me and give me the information I was asking for." R. 62 at 12. Leahy testified that the tone was "very conversational, like we're having right now." He also said that Godfrey "was a little shook up that the police were at her house," but that she was otherwise "fine" -- "very coherent," "very intelligent."

9

R. 62 at 38. Godfrey, at an earlier meeting with the government, said that the officers were polite. When asked about this statement on cross examination during the suppression hearing, she said that, "Yes, he was polite. But the thing about my kids. He threatened me about my kids. Other than that he was nice." R. 63 at 24. The officers flatly denied that anyone pointed a gun at Godfrey to obtain her consent.

After Godfrey consented to the search and signed the written consent form, the officers began to search the home. In the bedroom, Leahy found indications that Delancy was living in the house, including a utility bill in his name. R. 62 at 42. Delancy had not initially consented to a search of the residence. Having found the clothes and the utility bill in the bedroom, Leahy "wanted to give him an opportunity, if he wanted, to sign the consent to search." R. 62 at 43. Leahy also told Delancy that Godfrey had already consented to the search. Delancy then signed a consent form, too.[4] Delancy also consented to the search of one of the two vehicles registered in his name and parked at the house. Delancy did not, however, consent to the search of the second vehicle because he said it did not belong to him.

After obtaining the written consent, the officers conducted a thorough search

---

[4] The form was the same as the one signed by Godfrey.

10

of the house with the assistance of a canine unit. In the oven, they found cookies[5] of crack cocaine, bundles of cash, and individually bagged quantities of cocaine. In a utility closet in the kitchen, they found a semi-automatic AK-47 assault rifle loaded with two magazines of ammunition, one duct-taped to the other. This closet also contained quantities of crack cocaine, powder cocaine, and marijuana. The search team also found hundreds of small plastic bags marked with a red apple, which the government would have argued at trial was a brand label for the drugs. Cash and "pay and owe" sheets (narcotics accounting) were also discovered.

There were, however, two items found <u>before</u> Godfrey consented to the search of the apartment. While Leahy and Mercado were talking to Godfrey in the bedroom, Leahy observed two boxes of ammunition sitting in plain view on the bedroom windowsill. He did not seize the ammunition. The second piece of evidence discovered prior to Godfrey's consent was found by Frankhauser, the DEA agent. While Mercado and Leahy were in the bedroom at the rear of the home speaking with Godfrey, Delancy was outside the home with some other officers. At some point, the officers decided to bring Delancy back inside the house to question him. At the suppression hearing, counsel for the government argued that the

---

[5] "Cookies" are crack cocaine that has been formed into patties "approximately 3 inches in diameter and weighing approximately 1 ounce." <u>See</u> Nat'l Drug Intelligence Ctr., U.S. Dep't of Justice, Florida Drug Threat Assessment (July 2003), at <u>http://www.usdoj.gov/ndic/pubs5/5169/cocaine.htm</u>.

officers decided to bring Delancy back inside because it was inappropriate to conduct the interview outside in view of the neighbors, especially since Delancy was dressed in only a t-shirt and boxer shorts.

When Frankhauser learned of the decision to bring Delancy back inside, he recalled how he had seen Delancy "fidgeting" with the couch when the officers first arrived at the house:

> Based on when we first were knocking on the door, how the door opened, how the individuals in the house presented themselves by immediately slamming the door, the observation I made of Mr. Delancy at the couch, the whole interaction and his history, when I overheard he was going to be brought back into the house to be interviewed I wanted to make sure the couch area where I had seen him fidgeting was clear of any contraband and weapons that could harm law enforcement.

R. 62 at 67. Frankhauser then lifted up the seat cushion and found a bag containing bundled money and several small baggies of what appeared to him to be crack cocaine. Aside from the bullets seen in plain view and the money and drugs Frankhouser seized from the couch, all of the evidence was found after Godfrey consented to the search of the home.

## C.    District Court Findings

Review of a district court's denial of a motion to suppress is a mixed question of law and fact. United States v. Smith, 459 F.3d 1276, 1290 (11th Cir. 2006), cert. denied 127 S. Ct. 990 (2007). We review the district court's findings of

12

fact for clear error and construe the evidence in the light most favorable to the party prevailing below -- here, the government. See id. We review the district court's interpretation and application of the law de novo. Id. Here, the district court made detailed factual findings regarding disputed factual issues. Because these factual determinations are so important to our resolution of this case, we summarize them in some detail.

1. The operation was not a sham or subterfuge

One of Delancy's primary arguments before the district court was that the entire operation was a subterfuge or a sham. As the district court characterized the argument, Delancy claimed that the task force was a "subterfuge concocted to give the authorities a colorable reason to find and question, if necessary, or appropriate to search Mr. Delancy or his place of residence when in fact the real reason was to find and search for evidence of his criminal activity when authorities had no probable cause for the issuance of a search warrant." R. 65 at 4. The district court flatly rejected this assertion. Indeed, the court rejected Delancy's subterfuge claim not once but twice. See R. 65 at 4 ("I reject[] the contention . . . ."); id. ("I have rejected that assertion.").

2. The officers were reasonably concerned for their safety

The district court also found that the protective sweep was conducted

13

because the officers genuinely and reasonably believed that they were in danger. The court thought that the "officers were well advised to be concerned about the presence of firearms in this instance," referring to a briefing where Delancy was described as a "dangerous person." See R.65 at 7.

> They were told the operation involved a number of serious drug offenses and homicides, very dangerous crimes. Even though the defendant was not the subject of arrest he was somehow related to these very dangerous criminal activities. I think this put the officers, reasonably so, on alert that going out to an unfamiliar residence or other place to find Mr. Delancy that they should be on heightened alert with regard to their safety.

The court also took note of what it characterized as the "unusual suspicious circumstances that occurred at the front door . . . . [O]ne of the officers saw Mr. Delancy hiding something, something apparently small, a small object by the arm of the couch." R. 65 at 8. This behavior, the court found, provided a further basis for legitimate concern on the part of the officers: "A firearm would be classified as something a person would want to hide under a couch from law enforcement. Many firearms are small and could be slipped into a couch and pose a threat to law enforcement officers inside the house." R. 65 at 8. On the basis of these facts, the court found, under Maryland v. Buie, 494 U.S. 325 (1990), and its progeny, that "the officers had sufficient and articulable facts that justified their concern about their safety when they were at the residence." R.65 at 7.

14

3.     The sweep was brief and limited in scope

The district court's third important factual finding was that the protective sweep was limited in scope and duration. The court found that the sweep "was not overly broad and lengthy but was only as long as necessary to determine the house was safe." R. 65 at 9. The court found credible the officer's testimony that the sweep "was a relatively brief, cursory sweep." R. 65 at 9. As for the defendant's contention that the officers "made a thorough search and searched the oven before consent was given," the district court expressly rejected it, disbelieving Godfrey's testimony. R. 65 at 9–10.

4.     Godfrey voluntarily consented to the search

Next, the district court found that Godfrey's consent to the search was knowing, intelligent, and voluntary. The court rejected Godfrey's testimony that she consented only in response to threats. Indeed, in the officers' version of events, which the court expressly accepted as the more accurate representation, "there was [a] rifle present but it was not aimed at Miss Godfrey. The other firearms that were present had been holstered. And that [the officers] made no threats to her or her children or that her children would be taken away from her. And that she was not threatened in any way." R. 65 at 10–11. In the district court's view, Godfrey had a different reason for consenting: "It's apparent Miss Godfrey's consent was not

15

motivated by duress or threats by the officers but an attempt on her part to distance herself from the larger amount of drugs and dangerous guns and ammunition which she knew, in my opinion, were in the house." R. 65 at 11.

Accordingly, the court found, Godfrey's consent, "both oral and written, were both freely, knowingly and voluntarily given. I find they were not the result or the product of a prior illegal search, as the defendant contends." R. 65 at 12. The court made the same findings concerning Delancy's verbal and written consent -- that he consented freely and voluntarily, not because he was threatened verbally or physically, abused, or otherwise coerced.

5.    The officers were credible; Godfrey was not

Finally, we note that the district court made a series of explicit credibility determinations. It found that the officers were credible, and that Godfrey was not:

> I find that the officers' testimony was far more credible than Miss Godfrey. I listened very carefully to her testimony. I think [during oral argument on the motion] I indicated why I felt her testimony was in some material facts less than credible. I think I indicated it did not ring true under the circumstances.

R. 65 at 11; see also R. 65 at 10 ("I find the credible version was the Government's version of what occurred during and after the protective sweep itself.").

Regarding Godfrey's claim that the officers had threatened her with their weapons, the court was "very concerned if I were to think a police officer in the

16

presence of two children and a mother would actually point a gun at somebody." R. 64 at 27. However, the court came to the conclusion that Miss Godfrey was "stretching [the truth] a little bit." R. 64 at 27. Indeed, "[s]omething did not ring true with Miss Godfrey's testimony on that point. You recall I did ask her a question because I was watching her very carefully and she hesitated and she was trying to figure out what to say. I did not believe her." R. 64 at 28 (emphasis added). As for Agent Frankhauser, by contrast, "I don't know [him] from Adam's house cat but I found him to be one of the most credible witnesses I have seen in a long time." R. 64 at 29.

The trial court's credibility findings are striking in their thoroughness. For example, Godfrey had testified that she did not know that the gun or the drugs were in the house.[6] The court did not believe her: "I don't believe this lady lives with this man and does not have any knowledge of what he is doing. It's beyond belief. . . . The totality of the testimony, as well as the subsequent statements, it is simply not believable." R. 64 at 29. Godfrey also asserted that officers searched the house before she consented. Again, the court did not believe her. "I do not accept defendant's assertion that they made a thorough search and searched the oven

---

[6] Godfrey did not claim total ignorance. She said that she had argued with Delancy about bringing drugs into the house before, but that she did not know there were drugs in the house on the day of the search. R. 63 at 19

17

before consent was given." R. 65 at 9–10. Finally, Godfrey claimed that the officers had threatened to take her children away. Here, as with all Godfrey's testimony on the alleged police misconduct, the court did not believe her.

## II. DISCUSSION

### A. The Protective Sweep

A protective sweep "is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." Maryland v. Buie, 494 U.S. 325, 327 (1990). Here, it is important to note that what the government characterizes as a protective sweep was actually two separate searches: the initial entry into the house and the search of the couch, which occurred some time after the initial entry but before Godfrey consented to a full-scale search.

Delancy raises a number of challenges. First, he argues that, under Buie, a protective sweep is only permitted "incident to an arrest." Id.; see also id. at 334 ("[A]s an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be

18

immediately launched." (emphasis added)). Because the officers concededly did not have an arrest warrant or even probable cause to arrest Delancy, he claims that the officers could not conduct a protective sweep.

Delancy also observes that, even if a protective sweep may be permissible in a non-arrest context, Buie established a factual predicate that must be met before a sweep may be conducted. Sweeps are limited to situations where "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." Id. In this case, Delancy says, the factual predicate was not met -- the officers did not have any basis for believing that there was anyone in the house, let alone someone who presented a palpable danger. Moreover, because a sweep "lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises," id. at 335–36, the police could have avoided any danger by simply leaving the scene once they had Delancy.

Finally, Delancy argues that the protective sweep was overbroad. In support, he observes that the police lifted the mattress in the bedroom, an action inconsistent with the Supreme Court's mandate that a sweep be limited to a "cursory visual inspection of those places in which a person might be hiding."

19

<u>Buie</u>, 494 U.S. at 327 (emphasis added). The same claim was made as to the couch. Although Agent Frankhauser's decision to make sure that there were no weapons in the couch may have been amply supported by common sense, Delancy argues that the police could have completely avoided any danger by keeping Delancy outside the house or simply removing him from the scene.

The legality of the protective sweep is a difficult question. It requires balancing two deeply important interests -- the lives of law enforcement officers and the constitutional right of the people to be secure in their homes under the Fourth Amendment. This case implicates both interests. The police entered a private home without a warrant and without probable cause, raising important Fourth Amendment questions. The fact that they found a loaded AK-47 assault rifle inside that home is proof enough that their lives were also at risk. This case does not require us to decide the legality of the protective sweep, however, because, even if we assume that the sweep violated the Fourth Amendment, the evidence found during the <u>subsequent</u> search was admissible as the result of a voluntary consent.

**B.    Godfrey's Consent**

We focus on Godfrey's consent rather than Delancy's because Godfrey's is the better of the two. Godfrey consented first. Unlike Delancy, she was not

handcuffed or in police custody. Moreover, Delancy was told that Godfrey had already consented, so he arguably may have felt that his refusal would have been pointless.[7] Further, the police may have started to search after Godfrey consented but before Delancy gave his consent. The record is not entirely clear on this point, but Leahy did state that he "wanted to give [Delancy] an opportunity, if he wanted, to sign the consent to search," R. 62 at 43, because the officers had found men's clothing and a utility bill with Delancy's name on it in the bedroom.

The district court found that Godfrey's consent was given knowingly and voluntarily. As noted, the court made very clear that it did not believe the officers pointed their guns at Godfrey or threatened to take her children away. The district court did not believe that Godfrey was unaware there were drugs and an AK-47 in the house. Instead, the court found, Godfrey consented because she wanted to distance herself from the illegal activity. The court also found that Godfrey was a "reasonably educated, mature woman who understood the circumstances and understood what she was doing in giving her consent." R.65 at 11. These factual

---

[7] This was not, however, a situation where one resident consented and the other refused. See Georgia v. Randolph, 547 U.S. 103 (2006) (holding that a tenant cannot consent to admit the police over a co-tenant's express objection). The district court found that Delancy, like Godfrey, consented knowingly and voluntarily. He found that Delancy was not threatened, although he was placed in handcuffs when he was brought out of the house, and that there was no evidence that he was physically abused or coerced. The court also observed that Delancy "was not new to the criminal investigative process having been arrested on numerous prior occasions." R. 65 at 12. Finally, the district court noted, Delancy only granted consent to search one of the two vehicles registered in his name, thereby showing that he understood he had the right to refuse.

21

findings were not clearly erroneous. The court made detailed credibility determinations, and it simply did not believe Godfrey's claim.

Although the district court did not clearly err in finding that Godfrey voluntarily consented, this does not end our inquiry. Our analysis differs from the district court's because we have assumed, for purposes of argument, that the police were not permitted to enter the home to conduct a protective sweep. In making this assumption, we deal with the legal consequences of the putatively illegal sweep, an issue not raised under the district court's approach.

## C.    "Fruit of the Poisonous Tree"

Under controlling case law, we are required to conduct two separate inquiries where a consent to search follows prior illegal activity by the police. First, a court must determine whether the consent was voluntary. Second, the court must determine whether the consent, even if voluntary, requires exclusion of the evidence found during the search because it was the "fruit of the poisonous tree" -- the product of an illegal entry. See United States v. Santa, 236 F.3d 662, 676–77 (11th Cir. 2000):

> For consent given after an illegal seizure to be valid, the Government must prove two things: that the consent is voluntary, and that the consent was not a product of the illegal seizure. Thus, the voluntariness of consent is only a threshold requirement; a voluntary consent to search does not remove the taint of an illegal seizure. Rather, the second requirement focuses on causation: "whether,

22

granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."

(quoting Wong Sun v. United States, 371 U.S. 471, 488 (1963)) (citations omitted); see also United States v. Ramirez-Chilel, 289 F.3d 744, 752 n.9 (11th Cir. 2002) ("Typically, if the ensuing search occurs after an initial illegality, such as an illegal entry or an illegal arrest, we must first determine whether the consent to search was voluntary and then, whether the consent was tainted by the initial illegality.").

This two step approach is mandatory, and the government bears the burden on both issues. See United States v. Robinson, 625 F.2d 1211, 1219 (5th Cir. 1980).[8] Because we have found that the district court did not err in finding Godfrey's consent voluntary, this leaves only the second question: Whether the illegal entry tainted Godfrey's consent so that the evidence found after the consent should be excluded.

As the Supreme Court observed long ago, "[w]e need not hold that all

---

[8] As a former Fifth Circuit case decided before October 1, 1981, Robinson is binding precedent. See Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc). In Robinson, the district court had held that an investigatory stop was illegal but admitted evidence obtained in the subsequent search because it found that the defendant had voluntarily consented. We remanded the case because the court erred in omitting the second step in its analysis. The district court did not conduct the two-step analysis here because it believed that the sweep was conducted lawfully, so the Robinson issue was not raised. The record also reveals that both the court and counsel for the parties well understood this two-step analysis.

23

evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Wong Sun v. United States, 371 U.S. 471, 488 (1963) (quotation marks omitted). We are obliged to determine whether the consent was "sufficiently an act of free will to purge the primary taint of the unlawful invasion," or, alternatively, whether the causal connection had "become so attenuated as to dissipate the taint." Id. at 486–87 (quotation marks omitted).

This is a fact-specific question, and no single fact is dispositive. See Brown v. Illinois, 422 U.S. 590, 603 (1975). Normally, we would remand this question to the district court. But if the factual record is adequate, our binding precedent makes clear that we may conduct the Wong Sun analysis for the first time on appeal. See United States v. Waksal, 709 F.2d 653, 662 n.17 (11th Cir. 1983) ("[A]n appellate court may consider suppression based upon the taint of an illegality where there is no district court finding but where there is a sufficiently developed factual record . . . ."); United States v. Robinson, 690 F.2d 869, 878 n.6 (11th Cir. 1982) ("Although this issue is fact-sensitive, the determination must be made in light of

24

the distinct policies and interests of the Fourth Amendment, and accordingly the determination is one that we can appropriately make at the appellate level where the record is developed in sufficient detail."). In this case, the district court thoroughly addressed all of the critical facts necessary for us to conduct the legal analysis ourselves.

In Santa, we considered three factors in determining whether a defendant's consent was tainted by his illegal arrest:[9] "[1] the temporal proximity of the seizure and the consent, [2] the presence of intervening circumstances, and, particularly, [3] the purpose and flagrancy of the official misconduct." 236 F.3d at 677.

The three factors are not meant to be exhaustive, and commentators have suggested others. See 4 Wayne R. LaFave, Search and Seizure § 8.2(d) (4th ed. 2004) (discussing additional factors such as "whether the seizure brought about police observation of the particular object which they sought consent to search, . . . whether the consent was volunteered rather than requested by the detaining officers, whether the arrestee was made fully aware of the fact that he

_____

[9] Santa, like most cases applying attenuation analysis, involved an illegal arrest rather a prior illegal search. However, the Wong Sun analysis focused on determining when prior illegal activity may be considered free of the taint of that activity -- the specific form of the Fourth Amendment violation does not seem determinative. See 371 U.S. at 485–86; see also 4 Wayne R. LaFave, Search and Seizure § 8.2(d) (4th ed. 2004) (discussing cases where courts are "called upon to determine the admissibility of physical evidence obtained by a purported consent which was given following some form of illegal police action" and observing that "[a]nother form of prior illegality which may invalidate a consent is a search" (emphasis added)).

25

could decline to consent and thus prevent an immediate search of the car or residence, whether there has been a significant intervening event such as presentation of the arrestee to a judicial officer, and whether the police purpose underlying the illegality was to obtain the consent" (footnotes omitted)). Moreover, we will not allow a factor-based analysis to obscure the underlying question, which "generally involves a pragmatic evaluation of the extent to which the illegal police conduct caused the defendant's response." United States v. Bailey, 691 F.2d 1009, 1013 (11th Cir. 1982). Nevertheless, the factors do provide a useful structure. Applied here, they yield the conclusion that this search was consonant with the Fourth Amendment.

1.    Temporal Proximity

The time elapsed between the illegal act and a subject's consent to search is obviously relevant. If only a short period of time has passed, a court is more likely to consider the consent as a "poisonous fruit" of the illegal act -- that is, that the consent is tainted. Wong Sun provides an illustration of this principle. There, the Court suppressed statements from one defendant when they were given almost immediately after the police broke the door of his apartment, rushed in, and handcuffed him. See Wong Sun, 371 U.S. at 486 ("Six or seven officers had broken the door . . . into the bedroom where his wife and child were sleeping. He

26

had been almost immediately handcuffed and arrested. Under such circumstances it is unreasonable to infer that [his] response was sufficiently an act of free will to purge the primary taint of the unlawful invasion."). By contrast, when another defendant in the same case "had been released on his own recognizance after a lawful arraignment, and had returned voluntarily several days later to make the statement, [the Court] h[e]ld that the connection between the arrest and the statement had become so attenuated as to dissipate the taint." Id. at 491 (quotation marks omitted).

There is no bright-line rule defining the temporal factor. But, if the period of time is extremely short, this factor weighs in favor of exclusion. See, e.g., Santa, 236 F.3d at 666–67, 678 (observing that there had been no "significant lapse of time" in a case where the defendant, handcuffed and lying on the floor, consented to a search just two to three minutes after the police made an illegal forced entry into his home); see also United States v. Chanthasouxat, 342 F.3d 1271, 1280 (11th Cir. 2003) ("In the present case, there was an extremely close temporal proximity between the illegal stop and Chanthasouxat's consent to the search because the video tape revealed that only three minutes elapsed between the time Officer Carter stopped the van and Chanthasouxat consented to a search."). By contrast, a longer interval obviously weighs in favor of admissibility. See, e.g., Devier v. Zant, 3

27

F.3d 1445, 1459 (11th Cir. 1993) (per curiam) ("Under these circumstances, we must conclude that any taint from his detention on December 2 had been completely attenuated by the time of his eventual confession four days later.").

Here, the district court observed that, although the precise timing was unclear, the officers apparently spoke with Godfrey for 10 to 20 minutes. (Doc. 65 at 9–10.) Detective Mercado, who obtained Godfrey's consent, testified that he was in the house speaking with Godfrey for 10 to 15 minutes. (Doc. 62 at 26.) This is a relatively brief period of time. However, we are also mindful of the specific facts of this case. Even though the protective sweep and the consent were close in time, Godfrey was not handcuffed or detained. Moreover, the district court found that the interaction was conversational in tone, and that the officers did not threaten Godfrey in any way. In other words, the character of this interaction between the police and the person who consented stands in sharp contrast to cases like Santa. Had the officers aimed their guns at Godfrey, threatened her, or seized her, the passage of time may have been more important in the calculus. On these facts, however, timing is not the most important factor.

2. Intervening Circumstances

The second factor is the presence of intervening circumstances, or events that interrupt the causal connection between the illegal act and the possibly tainted

consent or confession. See Brown, 422 U.S. at 611 (Powell, J., concurring in part) (characterizing the inquiry as whether "some demonstrably effective break" has occurred); see also Taylor v. Alabama, 457 U.S. 687 (1982) (discussing a defendant who was arrested without probable cause "in the hope that something would turn up," and confessed shortly thereafter without any meaningful intervening event); United States v. Edmondson, 791 F.2d 1512, 1516 (11th Cir. 1986) (mentioning the defendant's removal from the scene of the arrest as an intervening circumstance).

The facts of this case suggest an important intervening circumstance: Godfrey's review and signing of the consent form, which served as a notification to Godfrey of her constitutional rights. The written form unambiguously informed Godfrey that she had a right to refuse to give consent, that she could demand that a warrant be obtained prior to any search, that she could consult with an attorney before consenting, that any contraband or evidence seized could be used against her in a court of law, and, finally, that she could withdraw her consent at any time. Agent Leahy testified that Detective Mercado went over the form with Godfrey carefully, and the district court found that Godfrey understood what it meant. Under the facts of this case, this thorough notification of constitutional rights constitutes an important intervening circumstance.

29

This is not to confuse notification with voluntariness. The two-prong (voluntariness and attenuation) nature of our inquiry has its origins in confession cases involving both the Fourth and Fifth Amendments. The Fifth Amendment's concern with individuals being forced to testify against themselves gave rise to the voluntariness prong, and the attenuation prong was added to accommodate the Fourth Amendment's concern with illegal arrests and searches. See Brown, 422 U.S. at 601 ("The exclusionary rule, however, when utilized to effectuate the Fourth Amendment, serves interests and policies that are distinct from those it serves under the Fifth. . . . [E]xclusion of a confession made without Miranda warnings might be regarded as necessary to effectuate the Fifth Amendment, but it would not be sufficient fully to protect the Fourth. Miranda warnings, and the exclusion of a confession made without them, do not alone sufficiently deter a Fourth Amendment violation.").

The written consent form is not relevant as an intervening circumstance simply because it demonstrates voluntariness. Rather, the form's value inheres in the fact that it shows Godfrey's awareness, at the time of her consent, of her rights under the Fourth Amendment. In a case involving a confession, the two issues would overlap -- a Miranda warning provides the notification of rights necessary to ensure that confessions are voluntary under the Fifth Amendment. Here, the oral

30

and written notification of rights was not directed towards the Fifth Amendment, but rather towards the Fourth. Accordingly, it has probative value independent of the voluntariness issue.

Godfrey was informed that she did not need to consent, and that she could consult with an attorney. She was made aware of her rights under the Fourth Amendment, and, according to the district court, she made a knowing, intelligent, and voluntary choice to sign the form in the absence of any coercion or threats from the police. In the context of the larger inquiry -- whether the consent was sufficiently independent of the illegal entry -- this fact, while not dispositive, supports the government's argument that the causal connection between the entry and the consent had "become so attenuated as to dissipate the taint." See Wong Sun, 371 U.S. at 487.

3.    Purpose and Flagrancy of Government Conduct

The final factor is the purpose and flagrancy of the official conduct. This factor is also the most straightforward, and here, the most important one. If the police entry had been made for the purpose of gaining consent to conduct a full-scale search, we would be bound to find the consent tainted. Indeed, when the police act with the express purpose of exploiting an illegal action, the causation is so obvious that no real attenuation analysis is even necessary. See Florida v. Royer,

460 U.S. 491, 505 (1983) (opinion of White, J.) (finding evidence seized after an illegal arrest tainted and omitting the attenuation analysis entirely when the seizure was part of "the officers' attempt to gain [the defendant's] consent to a search of his luggage").

Here, however, the district court squarely rejected Delancy's claim that the police effort was really "a subterfuge concocted to give the authorities a colorable reason to find and question, if necessary, or appropriate to search Mr. Delancy or his place of residence when in fact the real reason was to find and search for evidence of his criminal activity when authorities had no probable cause for the issuance of a search warrant." R. 65 at 4. This finding is not clearly erroneous, and it utterly negates Delancy's suggestion that the officers' stated purpose was a sham.

The district court believed the officers that they only sought to interview Delancy. More importantly, it accepted the officer's testimony that their only purpose in entering the home was to ensure their own safety, not to conduct a thoroughgoing search. Although we have assumed arguendo that the entry itself was unlawful, the district court's findings make clear that the police did not enter for an unlawful purpose. The distinction is critical.

This leaves the question of flagrancy. As it turned out, the police did not

need to enter the house, weapons drawn, when the only other person in the apartment was an unarmed mother and her two small children. But such is the benefit of hindsight. Once we accept the district court's finding that the officers entered the house out of genuine and legitimate concern for their safety, their actions, even if unlawful, were not flagrantly so. The officers did not handcuff Godfrey. They did not point their weapons at her, and they showed concern for the safety of her children. They did not, in fact, call the Department of Children and Families to take Godfrey's children away.

Moreover, and more critically, once inside the house, the officers did not act flagrantly. Instead, they conducted a brief, limited protective sweep. They did not tear the house apart looking for drugs. They did not open the oven, the drawers, the utility closet, or any of the other locations where they ultimately found large amounts of drugs and an AK-47. The only actions even arguably beyond the scope of a legitimate protective sweep were the search of the couch and possibly the lifting of the mattress.[10] Even the search of the couch, while outside the scope of a

---

[10] During oral argument before this Court, Delancy's counsel argued that the lifting of the mattress was so inconsistent with a legitimate protective search that it provided a basis to find clear error on the part of the district court. During the suppression hearing, one of the officers testified as follows:

Q:     The only thing you searched was the bedroom?

A:     I did not search the bedroom.

33

protective sweep, was far from a flagrant violation of the law. Again, Agent Frankhauser, who searched the couch, did so only when he "<u>overheard</u> [Delancy] was going to be brought back into the house to be interviewed." R. 62 at 67 (emphasis added). The decision to bring Delancy back inside the house and the resulting search of the couch may have been a mistake, but surely there is no way to characterize it as flagrant.

Most importantly, there is no suggestion that the police exploited the evidence found prior to consent. Notably, the officers did not use the drugs found in the couch to obtain consent. Indeed, Detective Mercado testified that he was totally unaware that the drugs had been found until after Godfrey consented to the search. The same is true of the bullets seen in plain view on the windowsill in the

---

Q: You said you picked up the mattress?

A: I was looking for subjects in the apartment.

Q: Sir, did you say you picked up the mattress to look under the mattress?

A: Yes, people hide under mattresses.

R. 62 at 31. This testimony is ambiguous, and the district court made no findings regarding the mattress. If the bed had a boxspring and a mattress, we would have a hard time seeing how lifting the mattress is consistent with a search "narrowly confined to a cursory visual inspection of those places in which a person might be hiding." <u>Maryland v. Buie</u>, 494 U.S. 325, 327 (1990). If the bed was a platform bed or a futon where lifting the mattress could reveal a person hiding <u>under</u> the bed, however, lifting the mattress would probably be permissible. Because the record does not make this clear, we resolve this ambiguity in favor of the government, the party that prevailed below. <u>See</u> <u>United States v. Smith</u>, 459 F.3d 1276, 1290 (11th Cir. 2006), <u>cert. denied</u> 127 S. Ct. 990 (2007) ("We review the district court's factual findings for clear error and construe those facts in the light most favorable to the prevailing party.").

34

bedroom. If this had been a situation where Godfrey was "face to face with the incriminating evidence [obtained by a prior illegal search] and able to see that the police had firm control over her home," the consent may have been tainted. See Holloway v. Wolff, 482 F.2d 110, 115 (8th Cir. 1973). But on this record, not only did the officers not use the bullets to gain consent, Godfrey testified that she did not even know that Delancy was prohibited from possessing ammunition. The very fact that the officers did not exploit the evidence they found in plain view during the sweep (the bullets) or prior to consent (the drugs found in the couch) is important evidence that they did not act in flagrant disregard of Godfrey's rights.

Taking all three factors together, and evaluating them as a whole, we conclude that the illegal entry did not taint Godfrey's consent. While the entry and the consent were close in time, we have explained why we do not think the temporal factor is as important in this case. Moreover, the fact that Godfrey was thoroughly informed of her Fourth Amendment rights through the consent form is highly significant. Most importantly, the officers did not enter with the purpose of gaining consent. What evidence they did find, they did not exploit.

Finally, this case involves the consent of a third party, not the defendant. Godfrey was not charged with any crime. While this does not mean that her Fourth Amendment rights were not violated, it is significant. The central question we must

answer is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Wong Sun, 371 U.S. at 488 (quotation marks omitted). In answering this inquiry, it is relevant to consider who is consenting.

When police exploit their illegal actions to obtain the consent of a defendant, the purposes of the exclusionary rule may be served by denying them the benefit of their improper actions. When they enter unlawfully but mistakenly and in good faith, and when they obtain the knowing, intelligent, and voluntary consent of a third party without exploiting their unlawful entry in any way, the purposes of the exclusionary rule would not be served by excluding valuable evidence. Indeed, as the Supreme Court recently reminded us:

> Suppression of evidence . . . has always been our last resort, not our first impulse. The exclusionary rule generates substantial social costs, which sometimes include setting the guilty free and the dangerous at large. We have therefore been cautious against expanding it and have repeatedly emphasized that the rule's costly toll upon truth-seeking and law enforcement objectives presents a high obstacle for those urging its application. We have rejected indiscriminate application of the rule and have held it to be applicable only where its remedial objectives are thought most efficaciously served -- that is, where its deterrence benefits outweigh its substantial social costs.

Hudson v. Michigan, 126 S. Ct. 2159, 2163 (2006) (citations, quotation marks, and alterations omitted).

If we are not to apply the exclusionary rule "indiscriminately," but rather only when its "remedial objectives are thought most efficaciously served," we should not apply it here. It is a fairly debatable question whether the circumstances that day were such that the officers were justified in entering Godfrey's house to conduct a protective sweep. Given the district court's thorough and detailed factual findings, however, there is no basis to conclude that applying the exclusionary rule here would deter police misconduct. Even if we assume that the officers' entry was unlawful, it was not a sham or made in bad faith. Once inside, they did not exploit the evidence they uncovered or coerce Godfrey into consenting. On this record, we can discern no gain in applying the exclusionary rule to keep out large quantities of drugs, tens of thousands of dollars in cash, and a loaded AK-47 in the possession of a convicted felon. The social cost of suppression, by contrast, is obvious.

## D.  Drugs in the Sofa

Having determined that the evidence found after Godfrey consented to the search of the house is admissible, we are left with the question of how to handle the drugs found in the sofa. We find little difficulty in concluding that these drugs were admissible under the inevitable discovery doctrine. In the Eleventh Circuit,

> [i]n order for evidence to qualify for admission under this exception to the exclusionary rule, there must be a reasonable probability that the evidence in question would have been discovered by lawful means, and the prosecution must demonstrate that the lawful means which

37

made discovery inevitable were being actively pursued[11] prior to the occurrence of the illegal conduct.

Jefferson v. Fountain, 382 F.3d 1286, 1296 (11th Cir. 2004); accord United States v. Terzado-Madruga, 897 F.2d 1099, 1114 (11th Cir. 1990); United States v. Satterfield, 743 F.2d 827, 846 (11th Cir. 1984); United States v. Brookins, 614 F.2d 1037, 1048 (5th Cir. 1980). As for the degree of certainty required, we have said that "we do not require absolute inevitability of discovery but simply a reasonable probability that the evidence in question would have been discovered other than by the tainted source." Brookins, 614 F.2d at 1042 n. 2.

Having accepted that Godfrey's consent was valid, we have no difficulty in concluding that the drugs found in the sofa were admissible under the inevitable discovery doctrine. This is because there was a "reasonable probability" that the drugs would have been found as a result of the consent anyway. Indeed, finding the drugs in the sofa was a near certainty -- the search, after all, involved a drug dog.

---

[11] This requirement is sometimes referred to as the "active pursuit" rule, and it is not adhered to by all circuits. However, it is clearly binding on us. See United States v. Virden, 488 F.3d 1317, 1322-1323 (11th Cir. 2007) ("This circuit also requires the prosecution to show that the lawful means which made discovery inevitable were being actively pursued prior to the occurrence of the illegal conduct. This . . . requirement is especially important. Any other rule would effectively eviscerate the exclusionary rule, because in most illegal search situations the government could have obtained a valid search warrant had they waited or obtained the evidence through some lawful means had they taken another course of action." (citations and quotation marks omitted)). The requirement is met here because Detective Mercado was "actively pursuing" Godfrey's consent before the drugs were found and did not become aware of their discovery until after her consent was given.

38

And having found drugs throughout the house (including in the kitchen oven), it is utterly inconceivable that the police, after having obtained Godfrey's consent, would not have searched the sofa, particularly since they had earlier observed Delancy place something there before coming outside.[12]

## III. CONCLUSION

Even if we assume that the officers violated the Fourth Amendment when they entered Godfrey's home to conduct a protective sweep, the district court did not err in admitting the evidence supporting Delancy's conviction. Godfrey knowingly and voluntarily consented to the search both orally and in writing, and the drugs and other evidence found after the consent were admissible because Godfrey's consent was not tainted by the illegal entry. As for the small quantity of

---

[12] Moreover, the amounts of drugs involved were so small a proportion of the whole that any failure to exclude them would have constituted harmless error beyond a reasonable doubt. See United States v. Rhind, 289 F.3d 690, 694 (11th Cir. 2002). According to the Miami Dade Police Department's laboratory analysis, Delancy was responsible for 104.5 grams of crack. Unless the crack found in the sofa constituted more than 54.5 grams of the total weight of the crack found in the house, the error was harmless because it could not have altered either the offense level under the Sentencing Guidelines or the statutory offense Delancy was charged with violating. Delancy's offense level of 32 covers amounts of cocaine base (crack) between 50 and 150 grams. See U.S.S.G. § 2D1.1(c)(4). (This does not even account for 2.3 grams of marijuana and 289.2 grams of cocaine, which have a much smaller impact under the Sentencing Guidelines.) A minimum of 50 grams of crack was also required for Delancy's conviction under 21 U.S.C. § 841(b)(1)(A)(iii). Accordingly, the error was harmless unless the crack in the sofa constituted more than 54.5 grams of the total -- exclusion of any lesser amount would still leave enough crack in evidence to meet the 50 gram threshold required by the Guidelines and the statute. Indeed, as Delancy conceded at oral argument before this court, the officers found "very little" crack in the sofa -- not enough to affect sentencing even if it had been suppressed.

drugs found before Godfrey consented to the search, they were admissible under the inevitable discovery doctrine. Accordingly, we affirm the district court's judgment and the ensuing conviction.

**AFFIRMED.**