[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
Oct. 6, 2009
THOMAS K. KAHN
CLERK

_____

No. 09-11218
Non-Argument Calendar

_____

D. C. Docket No. 08-60206-CR-KAM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JOHN HANS THOMAS,
a.k.a. Jules Lucien,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(October 6, 2009)

Before BLACK, BARKETT and KRAVITCH, Circuit Judges.

PER CURIAM:

Defendant-appellant John Hans Thomas appeals his conviction for

possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g). At issue in this case is whether the district court properly denied the motion to suppress evidence seized from Thomas's home.[1] Thomas contends that, in denying his motion to suppress, the district court erred in finding (1) the government witnesses more credible; (2) that probable cause and exigent circumstances justified the officers' warrantless entry into his home; and (3) that the consent forms signed by Thomas and his girlfriend were signed voluntarily. After a thorough review of the record and the briefs, we affirm.

"A district court's ruling on a motion to suppress presents mixed questions of law and fact." United States v. Ramirez-Chilel, 289 F.3d 744, 748-49 (11th Cir. 2002). We review "findings of fact for clear error and the application of the law to those facts de novo." United States v. Martinelli, 454 F.3d 1300, 1306 (11th Cir. 2006). In reviewing the district court's ruling, we must construe the facts in the light most favorable to the prevailing party below. United States v. Smith, 459 F.3d 1276, 1290 (11th Cir. 2006).

Credibility determinations are within the province of the fact finder "because the fact finder personally observes the testimony and is thus in a better position

---

[1] Thomas entered a conditional plea and reserved the right to appeal the denial of his motion to suppress. He was sentenced to 18 months' imprisonment. He was released from incarceration on July 31, 2009 and is currently serving his two-year term of supervised release.

than a reviewing court to assess the credibility of witnesses." Ramirez-Chilel, 289 F.3d at 749. Furthermore, if testimony presented by opposing witnesses at the hearing are in "direct conflict," the district court's decision to lend credence to one party's version should be "conclusive" and warrants reversal only if the court credits "exceedingly improbable" or even "unbelievable" testimony. Id. (quotations omitted). Likewise, we "must accept the [district court's interpretation of the] evidence unless it is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it." Id. (quotation omitted).

Thomas's first challenge on appeal is to the district court's credibility determination.

According to the testimony at the suppression hearing, Detective Osvaldo Tianga and Detective Samuel Wagers were on patrol when they observed a known drug user named Greg Saunders on a bicycle. They followed Saunders to Thomas's residence, where Saunders knocked on the door, spoke with Thomas, and exchanged money for a "small item." The detectives arrested Saunders a few blocks from the house and, after the detectives found a "baggy" of cocaine on Saunders, Saunders admitted that he had obtained the cocaine from Thomas for $20 at Thomas's residence.

3

Tianga initiated surveillance on Thomas's residence, contacted the state attorney's office, and prepared an application for a search warrant. Wagers continued the surveillance and Tianga left to e-mail the application to the state attorney's office and print out a warrant to be signed by a judge. Tianga was scheduled to meet with the judge later that day.

Before Tianga could obtain the warrant, a female, later identified as Thomas's girlfriend Angela McRae, arrived at the residence, entered through the backdoor, came out several times, and then walked to the sidewalk and looked directly at Wagers' vehicle. Wagers radioed Tianga that McRae had compromised the undercover surveillance. In order to avoid the destruction of evidence, and because Tiago believed he had probable cause for an arrest, Tianga decided to "seize" Thomas. Tianga obtained a house key from Thomas's landlord and arrived at the house within five minutes of the radio call from Wagers. Tianga noticed that the backdoor was not completely shut and was "kind of" propped open. Tianga entered the house and saw McRae, who shouted something to the effect of "the police are here." Tianga then observed Thomas exiting the bathroom. Tianga did not know whether there were others in the house or if anyone was armed.

Tianga and Wagers placed Thomas under arrest and handcuffed him. They then escorted Thomas, McRae, and two small children out of the residence and

4

conducted a security sweep inside with their guns drawn. They did not conduct a detailed search at that time. After the security sweep, the officers read Thomas his Miranda[2] rights, which Thomas agreed to waive. As Tianga was preparing to leave, he informed the other officers on the scene that he still had to meet with the judge to obtain a search warrant. Thomas and McRae overheard the conversation and questioned Tianga about the search warrant. Tianga explained that he believed there were narcotics inside the house, to which Thomas replied that "[t]here's nothing inside the house, only a couple bags of weed." Thomas inquired about his girlfriend and children, and Tianga informed him that Thomas was the only suspect at the moment, but that if, after obtaining the search warrant, officers discovered evidence inside the house implicating McRae, she would be "taken to jail" and their children could possibly be "going to protective services." Tianga testified, however, that despite this statement he did not believe "in [his] gut" that McRae was involved.

At this point, Thomas confirmed that McRae was not involved and offered to walk Tianga into the house to retrieve the marijuana. Thomas stated that he had a gun inside as well. Tianga informed Thomas that he needed both Thomas and McRae to sign a consent form and he read the forms out loud to Thomas and

---

[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

McRae.  The forms advised Thomas and McRae that they had the right to refuse consent and that they could require police to obtain a warrant.  After a private discussion, Thomas and McRae signed the forms.  Thomas then walked Tianga into the house and produced two bags of marijuana in the bedroom, a gun inside the closet, and $720 in "drug money" in a shirt pocket in the closet.  Tianga conducted a more detailed search afterward and discovered cocaine in the bathroom.

McRae testified that she arrived home and started to prepare dinner.  Once she got home, she stayed inside the house and did not go outside again.  She admitted that she looked out the window and noticed someone was parked across the street, but claimed that she did not realize it was the police.  While she was in the kitchen, Tianga used a key to enter the house through the backdoor, ordered everybody outside, and told her that if she did not sign a consent form, she would be arrested and her children would go to "HRS."  She signed the consent form because of the threats and because Tianga said he was going to get a warrant any way.  She denied any knowledge of the drugs.

The government recalled Tianga, who testified that McRae had informed him on the day of the incident that the drugs in the house belonged to Thomas and that she had nothing to do with it.  Tianga also stated that McRae lied about not

6

noticing police surveillance because she also had revealed to him that Thomas had spotted the police first and she went outside to investigate further.

Based on this testimony, the district court found that the officers were more credible than McRae. We conclude that this finding was not erroneous. The district court observed the demeanor of each witness and was in the best position to review credibility. On this basis, we accept the district court's credibility determination.

We next turn to the issue of whether the police properly entered the home based on probable cause and exigent circumstances.

The Fourth Amendment protects the right of persons to be free from unreasonable searches and seizures. U.S. Const. amend. IV. A "warrantless entry into a suspect's home to search the premises is presumed to be unreasonable." Ramirez-Chilel, 289 F.3d at 751. Nevertheless, there are exceptions to this general rule, such as where the combination of probable cause and exigent circumstances justifies a warrantless home intrusion. United States v. Tobin, 923 F.2d 1506, 1510 (11th Cir. 1991) (en banc). Probable cause exists when, under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be discovered in a particular place. Id. Exigent circumstances exist when the situation demands an immediate response from police officers. United States v.

Holloway, 290 F.3d 1331, 1334 (11th Cir. 2002). A warrantless search under exigent circumstances must be "strictly circumscribed by the exigencies which justified its initiation." Mincey v. Arizona, 437 U.S. 385, 392-93, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290 (1978) (quotation omitted). Likewise, an exigency only excuses a "limited" intrusion and, once inside the residence, the officers may only seize evidence "found within plain view." Holloway, 290 F.3d at 1334.

Exigent circumstances can occur where the risk of removal or destruction of narcotics exists. Tobin, 923 F.2d at 1510. We have held that narcotics cases can present a "particularly compelling" need for the exigent circumstances doctrine because "contraband and records can be easily and quickly destroyed while a search is progressing." United States v. Young, 909 F.2d 442, 446 (11th Cir. 1990). In determining whether agents reasonably feared imminent destruction of evidence, the appropriate inquiry is whether a reasonable, experienced agent would believe that, at the moment of entry, evidence might be destroyed before a warrant could be secured. Id.

Here, the district court properly concluded that probable cause and exigent circumstances justified the warrantless intrusion into Thomas's residence. The officers reasonably believed that narcotics were present and might be destroyed before a warrant could be secured, and their intrusion was limited and directly

8

proportional to the exigency of this case. Accordingly, we conclude that probable cause and exigent circumstances permitted the officers to enter the house.

Finally, we turn to the issue of whether Thomas's and McRae's consents to the subsequent search were voluntary. Thomas argues that both he and his girlfriend only consented based on explicit threats to arrest his girlfriend and send their children to social services if they did not cooperate.

A person can consent to a search, but in order for a consensual search to be constitutional, it must be voluntary. United States v. Acosta, 363 F.3d 1141, 1151 (11th Cir. 2004). Consent to a warrantless search is voluntary if it is "the product of an essentially free and unconstrained choice." United States v. Garcia, 890 F.2d 355, 360 (11th Cir. 1989). Voluntariness is a question of fact based on the totality of the circumstances. Acosta, 363 F.3d at 1151. In evaluating voluntariness of consent, a court "should look at several indicators, including the presence of coercive police procedures, the extent of the defendant's cooperation with the officer, the defendant's awareness of his right to refuse consent, the defendant's education and intelligence, and the defendant's belief that no incriminating evidence will be found." United States v. Simms, 385 F.3d 1347, 1355 (11th Cir. 2004).

The facts of this case are similar to those of United States v. Delancy, 502

F.3d 1297 (11th Cir. 2007). In that case, police sought to question Delancy as a material witness. After being unable to find Delancy, they went to the home of his girlfriend, LaSandra Godfrey. They approached the house with weapons drawn and observed the door open and quickly close. When Delancy exited the house a short time later, police handcuffed him and took him into custody. Police then entered the house to conduct a protective sweep and found Godfrey and her children inside. After speaking with police, Godfrey gave oral and written consent to search the house. Delancy subsequently gave his consent. During the search that followed, police found drugs and a firearm. 502 F.3d at 1301-04. Delancy challenged the search and the consent given by both Godfrey and himself, claiming that the police requested consent while their guns were drawn and after threatening to take Godfrey's children to protective services. Id. at 1302-03. The district court found the testimony of the officers was more credible than that of Delancy and Godfrey and therefore concluded the consent was voluntary. On appeal, this court focused on Godfrey's consent and concluded it was voluntary in light of the officers' credible testimony. Id. at 1308.

We are persuaded by the court's reasoning in Delancy to conclude the consents given by Thomas and McRae were voluntary. The district court found the testimony of the officers involved was more credible. Thus, we reject, as the

10

district court did, Thomas's and McRae's claims of coercion.

The remaining facts of the case do not establish that the consent was involuntary. First, although Thomas was handcuffed and under arrest, McRae was not. See Delancy, 502 F.3d at 1307. Additionally, Thomas initiated the conversation with police; he was not subject to any questioning or coercion. Moreover, the consent form advised Thomas and McRae of their right to refuse consent. Simms, 385 F.3d at 1355. Under these facts, we conclude the consents given by Thomas and McRae were voluntary.

For the foregoing reasons, we affirm Thomas's conviction.

**AFFIRMED.**