[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 13, 2012
JOHN LEY
CLERK

_____

No. 10-14649

_____

D.C. Docket No. 0:09-cr-60212-KAM-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

GREGORY WELCH,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(June 13, 2012)

Before DUBINA, Chief Judge, FAY, and KLEINFELD,* Circuit Judges.

_____

* The Honorable Andrew J. Kleinfeld, Senior United States Circuit Judge for the Ninth
Circuit, sitting by designation.

KLEINFELD, Senior Circuit Judge:

We address whether consent to a search was voluntary and whether it was "fruit of the poisonous tree." We also address whether a Florida conviction for robbery is a "violent felony" under the Armed Career Criminal Act.

**Facts**

Broward County sheriff's deputies had probable cause to believe that a John Jacobs had robbed a convenience store. Two people had been shot during the robbery. The deputy sheriffs learned that Jacobs lived with his mother in an apartment complex behind the store, and "frequented" two other apartments there, Gregory Welch's being one of them. Two days after the robbery, thirteen officers went to the three apartments looking for Jacobs. They had not obtained search or arrest warrants. The plan was to have groups of three officers knock simultaneously on the doors and ask whomever was there whether they had seen Jacobs. The police knew what Jacobs looked like, because one of the robbery victims had identified him from a photograph.

Someone other than Jacobs answered the door at Welch's apartment. The

2

three officers at the door asked him if anyone else was there, and he said there was, but would not say who. The police entered and did a "limited protected sweep" to see if anyone inside posed a threat to them. Welch was in a bedroom on the bed talking on a cell phone, smoking a "joint," and minding a baby. The police had drawn their guns before entering the apartment, but holstered them when they saw Welch on the bed.

The police took Welch out onto the balcony. They heard on the police radio that Jacobs had been arrested, so now they were looking only for his gun. They asked Welch if they could search his apartment. He refused. When the police told him they would then have to get a search warrant, which "would take a while," he consented orally and signed a written consent form. It was "four or five minutes, if that" from when the police entered the apartment to when they asked for consent, and another "several" minutes between oral and written consent. The police then searched the apartment, and found Welch's pistol (which was not the gun Jacobs had used in the robbery) and ammunition in "an attic space." After the police found the pistol and cartridges, they put Welch in their van, in the passenger seat and without handcuffs, and he admitted that the pistol and ammunition were his.

3

Though Welch testified otherwise, the district court found that: (1) the police did not search the apartment until Welch gave his written consent; (2) the police did not threaten to ransack the apartment if he refused consent; (3) the police did not threaten to have the Department of Children and Families take Welch's children away if he refused consent; and (4) the consent form was read and explained to Welch. The district court found that Welch was not intimidated into consenting by the police, as was shown by his initial refusal as well as the plain advice of rights in the form. Rather, the court found, Welch consented because he was not going to be allowed back into the apartment to somehow dispose of the handgun and ammunition, so it made sense for him to agree to the search and hope the police would not find his hiding place.

The district court denied Welch's motion to suppress the pistol and his statements in the police car. The court held that the initial "protective sweep" was unlawful, because the police were not lawfully in the apartment. They entered to do the sweep, instead of doing the sweep because they had lawfully entered and needed to protect themselves after doing so. The question, as the court saw it, was whether the consent to search was voluntary, and whether the discovery of the pistol and Welch's admission were "tainted" by the unlawful entry that led to

4

them. The court held that the consent was voluntary, and that the consent and admission were not tainted.

Welch pleaded guilty to being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1), reserving the right to appeal the denial of his motion to suppress. The presentence report categorized Welch as an armed career criminal because of three prior violent felony convictions, and concluded that the Armed Career Criminal Act required that he be sentenced to a minimum of fifteen years in prison because of these prior convictions.[1] That sentence was imposed, subject to Welch's reservation of the right to challenge it. Only one of the predicate offenses is challenged in this appeal, a 1996 conviction for Florida strong arm robbery.

**Analysis**

A.    **The Motion to Suppress**

Welch argues that the pistol and ammunition should be suppressed because they were found in an unlawful search, and that his subsequent statements made while he was sitting in the passenger seat of the police car should be suppressed

---

[1] 18 U.S.C. § 924(e).

because the putatively unlawful sweep brought them about. The government argues that the initial entry into the apartment was not unlawful, though the district court concluded that it was. We need not decide this question. Even if the sweep was unlawful, the government could avoid suppression if it showed that Welch's consent to the search was voluntary, and that it was not tainted by the unlawful sweep.[2] We, like the district court, so conclude.

Denial of a motion to suppress is a mixed question of law and fact.[3] The district court's findings of fact control unless they are clearly erroneous, but its interpretation and application of law are reviewed de novo.[4]

The first question we address is whether Welch's consent and admissions were "fruit of the poisonous tree," the "poisonous tree" being the putatively unlawful sweep. It is undisputed that the officers who entered Welch's room did so with their guns drawn, but holstered them when they saw that Welch was unarmed. And it is undisputed that Welch consented to the search, first orally and

---

[2] United States v. Delancy, 502 F.3d 1297, 1308 (11th Cir. 2007).

[3] Id. at 1304.

[4] Id.

then in writing, within a few minutes of being escorted onto his balcony. Most importantly, it is undisputed that Welch initially refused to consent.

Two precedents control our analysis, United States v. Santa[5] and United States v. Delancy.[6] In both cases, we considered three factors that gave us a "useful structure" to determine whether a defendant's consent was tainted by illegal police actions: the time elapsed between the illegal act and the search, any intervening circumstances, and the purpose and flagrancy of the unlawful government conduct.[7] In Santa, the consent, even if voluntary, "did not purge the primary taint of the illegal entry and arrest."[8] The suspect was still on the floor, handcuffed, three minutes after the DEA had broken down his door and burst into his apartment, when he told them where they could find the drugs. The search and discovery of the evidence were all over by the time he signed the consent form.[9] Santa is of no help to Welch, because Welch was standing on the balcony, not handcuffed, when he consented, and he initially refused to consent. No search

---

[5] United States v. Santa, 236 F.3d 662 (11th Cir. 2000).

[6] United States v. Delancy, 502 F.3d 1297 (11th Cir. 2007).

[7] Id. at 1309–10.

[8] Santa, 236 F.3d at 677.

[9] Id. at 677–78.

occurred until he changed his mind. It is one thing to consent to a police request while flat on one's face on the floor and handcuffed, quite another when chatting without any physically forcible coercion after having left the scene of the police intrusion.

This distinction bears on the difference between Santa and Delancy. Delancy assumes, as we do, that the protective sweep was unlawful, but, as in this case, the district court found that the sweep was for the protection of the officers, not a subterfuge to intimidate and question the appellant.[10] Had the entry "been made for the purpose of gaining consent," then the consent would be tainted, because attenuation analysis is unnecessary "when the police act with the express purpose of exploiting an illegal action."[11] That is the central principle of a search that is unconstitutional as "fruit of the poisonous tree" despite voluntary consent.[12] And once inside, albeit unlawfully, the officers neither in Delancy nor here acted "flagrantly" by "tear[ing] the house apart."[13] There and here, "timing is not the

[10] Delancy, 502 F.3d at 1312.

[11] Id.

[12] See Wong Sun v. United States, 371 U.S. 471, 488, 83 S. Ct. 407, 417, 9 L. Ed. 2d 441 (1963).

[13] Delancy, 502 F.3d at 1313.

8

most important factor."[14] We decide whether consent was tainted by illegality with "a pragmatic evaluation of the extent to which the illegal police conduct caused the defendant's response," not with a stopwatch.[15]

"When [police] enter unlawfully but mistakenly and in good faith, and when they obtain the knowing, intelligent, and voluntary consent of a third party without exploiting their unlawful entry in any way, the purposes of the exclusionary rule would not be served by excluding valuable evidence."[16] In this case, as in Delancy, there was no such exploitation and is no "taint" such as to make the evidence "fruit of the poisonous tree," if the consent was voluntary.[17] And it was.

We review voluntariness as a factual question that is determined under the totality of the circumstances.[18] Relevant factors include "voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent

---

[14] Id. at 1311.

[15] Id. at 1310 (internal quotation marks and citations omitted).

[16] Id. at 1314.

[17] Cf. Oregon v. Elstad, 470 U.S. 298, 306, 105 S. Ct. 1285, 1291, 84 L. Ed. 2d 222 (1985).

[18] United States v. Blake, 888 F.2d 795, 798 (11th Cir. 1989).

9

and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found."[19]

Welch argues he was coerced into giving consent. The officers asked for consent a few minutes after entering his bedroom with their guns drawn. But Welch must not have felt coerced into consenting when they first asked, because he declined to consent. They took him out on the balcony, asked if they could search, and he told them they could not. A person who actually says "no" has not been coerced into saying "yes."

Thus at least up to the time Welch refused to consent, he cannot be said to have been coerced into consenting involuntarily. That leaves, for analysis of coercion and voluntariness, what happened after he said "no." The police officer standing on the balcony with him said, "Fine, but we're going to have to get a search warrant." That is not coercion vitiating voluntariness. And it did not. Welch still did not consent. What changed his mind was the officer's next remark,

---

[19] Id.

that "it would take a while."

The explicit threat here is that Welch might have to stand around with nothing to do for some substantial period of time, much as we all do whenever we are stuck in a line. It would be a delicate will indeed that might be overborne by the threat of a period of idleness and wasted time. Yet that threat, "it would take a while," is what changed Welch's "no" to a "yes."[20]

The district judge provided a persuasive explanation of why Welch changed his mind. Welch, the court found, "reasonably believed that the officers would eventually be able to obtain a search warrant" and that, because he would have to wait on the balcony while they did, he would not be able to go into the apartment, retrieve the pistol and ammunition, and somehow dispose of them before the police came back with a warrant. So "it made sense for [Welch] to agree to the search rather than wait for the warrant to be obtained and, because of where the

---

[20] Although Welch testified that the officers threatened to send his children to Child Services if he did not consent, the judge found that he was not telling the truth, and that this did not occur. That threat could not overbear his will, if, as the court reasonably found, it was not made. We do not mean to imply that a warning that social workers will come to care for children if their adult caregivers become unavailable on account of detention is necessarily an improperly coercive threat, as opposed to helpful information assuring that children will not be abandoned to the street.

11

items were hidden, hope for the best." That was a rational gamble, but one that

Welch lost. Welch's consent was not coerced, just constrained, by having to place

his bet on one of two poor alternatives. Maybe if he let them in, the police would

want to get the search done quickly and fail to find his contraband. Or maybe if he

put them to the trouble of getting a search warrant, they would search more

thoroughly because he had inconvenienced them.

The district court's findings were supported by the evidence and its

conclusion that Welch gave legally efficacious consent to the search was correct.

### B.      Whether Florida Robbery Is a "Violent Felony"

The ordinary maximum sentence for being "a felon in possession of a

firearm" is ten years imprisonment.[21] But if a felon in possession has three

previous convictions for violent felonies or serious drug offenses, then the Armed

Career Criminal Act requires a minimum sentence of fifteen years imprisonment.[22]

Welch had three previous potentially qualifying convictions when he was

sentenced to this statutory minimum. He argues on appeal that his 1996 Florida

---

[21]  18 U.S.C. §§ 922(g)(1), 924(a)(2).

[22]  18 U.S.C. § 924(e).

12

conviction for strong arm robbery does not qualify as a "violent felony." If that conviction were not counted as a predicate offense, he would not be subject to the statutory minimum.

The parties argue the case primarily under the categorical approach, not the modified categorical approach.[23] The record cognizable for purposes of the statutory enhancement is sparse. The presentence report says that according to the victim, Welch punched him in the mouth, fought with him, and grabbed his gold bracelet from his wrist, while another robber took the gold chain from the victim's neck. But the presentence report does not state the source of this information, and the record merely includes an information alleging that Welch unlawfully took jewelry from the victim's person "by the use of force, violence, assault, or putting . . . in fear," and a judgment showing that Welch pleaded guilty to this information, and was convicted of "strong arm robbery" in violation of Florida Statute Section 812.13(1). We decide this issue under the categorical approach.

The federal Armed Career Criminal Act defines "violent felony" as felonies

---

[23] "Under [the categorical] approach, we look only to the fact of conviction and the statutory definition of the prior offense, and do not generally consider the particular facts disclosed by the record of conviction." James v. United States, 550 U.S. 192, 202, 127 S. Ct. 1586, 1594, 167 L. Ed. 2d 532 (2007) (internal quotation marks and citations omitted).

13

that have as an element the "use, attempted use, or threatened use of physical force," or that are "burglary, arson, or extortion, involve[] use of explosives, or otherwise involve[] conduct that presents a serious potential risk of physical injury to another."[24] Welch's Florida robbery conviction was pursuant to a statute that criminalized stealing property from another's person or custody using "force, violence, assault, or putting in fear."[25]

Welch's argument is that the degree of "force" required to violate the state statute at the time of his conviction was too slight to satisfy the federal statute. His point is that Florida law at the time made mere snatching a robbery, and that mere snatching is not forceful enough to satisfy the federal statute under either the "elements clause" or the "residual clause" ("serious potential risk of physical injury to another") of the federal statute. We review de novo whether a prior

---

[24] "[T]he term 'violent felony' means any crime punishable by imprisonment for a term exceeding one year . . . that—(i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another[.]" 18 U.S.C. § 924(e)(2)(B).

[25] "'Robbery' means the taking of money or other property which may be the subject of larceny from the person or custody of another, with intent to either permanently or temporarily deprive the person or the owner of the money or other property, when in the course of the taking there is the use of force, violence, assault, or putting in fear." Fla. Stat. § 812.13(1).

14

crime qualifies as a violent felony under the statute.[26] In "determining whether a defendant was convicted of a 'violent felony,' we [turn] to the version of state law that the defendant was actually convicted of violating."[27]

In 1996, when Welch pleaded guilty to robbery, Florida law clearly established that a taking by stealth, as in pickpocketing where the victim is not aware of the theft, was merely larceny, not robbery.[28] But the state courts of appeal were divided on whether a snatching, as of a purse, or cash from a person's hand, or jewelry on the person's body, amounted to robbery.[29] Subsequently, a new Florida statute established the crime of "robbery by sudden snatching," in

---

[26] United States v. McGill, 618 F.3d 1273, 1274–75 (11th Cir. 2010).

[27] McNeill v. United States, ___ U.S. ___, 131 S.Ct. 2218, 2222, 180 L. Ed. 2d 35 (2011).

[28] See McCloud v. State, 335 So. 2d 257, 258–59 (Fla. 1976).

[29] See, e.g., Goldsmith v. State, 573 So. 2d 445, 445 (Fla. 2d Dist. Ct. App. 1991) (holding that the "slight force used . . . to remove the bill from [the victim's] hand" was "insufficient to constitute the crime of robbery"); A.J. v. State, 561 So. 2d 1198, 1198 (Fla. 3d Dist. Ct. App. 1990) (holding that "the degree of force used to [grab a camera hanging from the victim's shoulder] was insufficient to constitute robbery"); Larkins v. State, 476 So. 2d 1383, 1385 (Fla. 1st Dist. Ct. App. 1985) (holding that "sufficient force was exercised to fulfill the requirements of the robbery statute" where the robber grabbed cash out of the victim's hand); Andre v. State, 431 So. 2d 1042, 1043 (Fla. 5th Dist. Ct. App. 1983) (holding that "the act of 'snatching' . . . money from another's hands is force and that force will support a robbery conviction").

15

between larceny and robbery.[30]  This statute appears to have been a legislative response to a 1997 Florida Supreme Court decision holding that "there must be resistance by the victim that is overcome by the physical force of the offender" to establish robbery, so that the intermediate appellate decisions holding mere snatching to be sufficient were put in doubt.[31]  Welch pleaded guilty before the Florida Supreme Court decision and the new statute, in a judicial district that had not yet spoken definitively on the question,[32] and at a time when the controlling Florida Supreme Court authority held that "any degree of force" would convert larceny into a robbery.[33]  So we assume for purposes of analysis that Welch pleaded guilty to robbery at a time when mere snatching sufficed.[34]

---

[30] "'Robbery by sudden snatching' means the taking of money or other property from the victim's person, with intent to permanently or temporarily deprive the victim or the owner of the money or other property, when, in the course of the taking, the victim was or became aware of the taking.  In order to satisfy this definition, it is not necessary to show that: (a) The offender used any amount of force beyond that effort necessary to obtain possession of the money or other property; or (b) There was any resistance offered by the victim to the offender or that there was injury to the victim's person."  Fla. Stat. § 812.131 (2000).

[31] Robinson v. State, 692 So. 2d 883, 886 (Fla. 1997) (holding that robberies must "be accomplished with more than the force necessary to remove the property from the person").

[32] See Santiago v. State, 497 So. 2d 975, 976 (Fla. 4th Dist. Ct. App. 1986) (holding that where a defendant reached into a car and tore necklaces off of a victim's neck, leaving scratch marks, evidence of force was sufficient to support a robbery because the "facts of this case, unlike picking a pocket or snatching a purse without any force or violence, show sufficient force, be it ever so little, to support robbery") (emphasis added).

[33] McCloud v. State, 335 So. 2d 257, 258–59 (Fla. 1976).

[34] "A federal court applying state law is bound to adhere to decisions of the state's intermediate appellate courts absent some persuasive indication that the state's highest court

16

United States v. Lockley holds that Florida attempted robbery is a "crime of violence" under the Sentencing Guidelines.[35] Welch argues that we should distinguish Lockley for two reasons. First, Welch points out that Lockley held that Florida attempted robbery is a "crime of violence" under the Sentencing Guidelines,[36] while the issue here is whether Florida robbery is a "violent felony" under the Armed Career Criminal Act.[37] Second, Welch argues that we should distinguish Lockley because Lockley was convicted after Florida promulgated the "sudden snatching" statute, so snatching from the person might furnish the basis for a robbery conviction here but not in Lockley.

We conclude that even though these distinctions may fairly be made, they should make no difference. We have recognized that the definitions of "crime of

---

would decide the issue otherwise." Silverberg v. Paine, Webber, Jackson & Curtis, Inc., 710 F.2d 678, 690 (11th Cir. 1983).

[35] United States v. Lockley, 632 F.3d 1238, 1246 (11th Cir. 2011).

[36] "The term 'crime of violence' means any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that—(1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or (2) is burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another." U.S.S.G. § 4B1.2(a) (2002).

[37] "[T]he term 'violent felony' means any crime punishable by imprisonment for a term exceeding one year . . . that—(i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another[.]" 18 U.S.C. § 924(e)(2)(B).

17

violence" under the Sentencing Guidelines and "violent felony" under the Armed Career Criminal Act are "virtually identical," and have held that "[c]onsidering whether a crime is a 'violent felony' . . . is similar to considering whether a conviction qualifies as a 'crime of violence[.]'"[38]  We see no reason not to apply Lockley to a case addressing whether Florida robbery is a "violent felony" under the Armed Career Criminal Act.

We also see no reason not to apply Lockley to 1996 Florida robbery, even if robbery at that time could be accomplished by mere snatching.  Welch's strongest argument comes from a footnote in Lockley distinguishing the new "robbery by sudden snatching" statute.  It notes that while sudden snatching involves "pick-pocketing or other similar activity (so long as the victim is in possession of the money or property and realizes he is being victimized)," robbery under the Florida robbery statute "concerns a far more aggressive and potentially violent form of robbery."[39]  Though Lockley does not reach the question of whether robbery by sudden snatching would or would not present "a serious risk of physical injury to another" under the residual clause, we conclude that it does.

---

[38]  U.S. v. Alexander, 609 F.3d 1250, 1253 (11th Cir. 2010) (internal quotation marks and citations omitted).

[39]  Lockley, 632 F.3d at 1246 n.7.

Welch correctly points out that under Johnson v. United States, "physical force" means not merely what "force" means in physics, but "violent force—that is, force capable of causing physical pain or injury to another person."[40]  That Johnson discussion was in the context of the elements clause requirement of "physical force," not the residual clause requirement of "serious risk of potential injury to another."  Arguably the elements clause would not apply to mere snatching, but the issue is not cut and dried.  We need not decide whether snatching is sufficiently violent under the elements clause, though, because it suffices under the residual clause.

We look at the statute of conviction to see whether, under the residual clause, "the conduct encompassed by the elements of the offense, in the ordinary case, presents a serious potential risk of injury to another."[41]  Under United States v. Harrison, we apply a three-step analysis to see: (1) how the crime is ordinarily committed; (2) whether the crime poses a "serious potential risk of physical injury," similar in degree to the listed crimes; and (3) whether the crime is similar in kind to the listed crimes, or, using the language from Begay v. United States,

---

[40]  Johnson v. United States, ___ U.S. ___, 130 S. Ct. 1265, 1271, 176 L. Ed. 2d 1 (2010).

[41]  James, 550 U.S. at 202, 208.

19

whether the crime is "purposeful, violent, and aggressive."[42] Sykes v. United States partially abrogated Harrison,[43] and we recently revisited Harrison in United States v. Chitwood.[44] Chitwood limits Begay's "purposeful, violent, and aggressive" language to "strict liability, negligence, and recklessness crimes."[45] Offenses that are not "strict liability, negligence, and recklessness crimes," like robbery, fall within the residual clause "if they categorically pose a serious risk of physical injury that is similar to the risk posed by one of the enumerated crimes."[46]

Sudden snatching ordinarily involves substantial risk of physical injury to the victim. The victim's natural reaction is likely to be to try to hold on to his or her money or property, leading in many cases to serious injury. For example, in the Florida Supreme Court case with the "any degree of force" language, the old woman died from the fall she took when the robber grabbed her purse in a parking

---

[42] United States v. Harrison, 558 F.3d 1280, 1287 (11th Cir. 2009); Begay v. United States, 553 U.S. 137, 145, 128 S.Ct. 1581, 1586, 170 L. Ed. 2d 490 (2008).

[43] Sykes v. United States, ___ U.S. ___, 131 S. Ct. 2267, 2277, 180 L. Ed. 2d 60 (2011).

[44] United States v. Chitwood, 676 F.3d 971 (11th Cir. 2012).

[45] Id. at 979; United States v. Schneider, ___ F.3d ___, 2012 WL 1868645, at *5 (11th Cir., May 24, 2012).

[46] Id.

lot.[47]  In that respect, the crime is much like burglary, where if the victim perceives what is going on, a violent encounter is reasonably likely to ensue.[48]

We conclude that Florida robbery, both before and after Florida promulgated the "robbery by sudden snatching" statute, qualifies as a violent felony under the Armed Career Criminal Act.

**AFFIRMED**.

---

[47]  McCloud v. State, 335 So. 2d 257, 258 (Fla. 1976).

[48]  "The main risk of burglary arises not from the simple physical act of wrongfully entering onto another's property, but rather from the possibility of a face-to-face confrontation between the burglar and a third party—whether an occupant, a police officer, or a bystander—who comes to investigate."  James, 550 U.S. at 203, 127 S. Ct. at 1594.