[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-11583
Non-Argument Calendar
_____

D.C. Docket No. 1:11-cr-00203-KD-N-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RICHARD DOUGLAS DURHAM,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

(October 5, 2012)

Before HULL, MARCUS and FAY, Circuit Judges.

PER CURIAM:

Richard Douglas Durham appeals his conviction for possession of

ammunition by a convicted felon, in violation of 18 U.S.C. § 922(g)(1).  On appeal, he argues that: (1) the district court erroneously denied his motion to suppress evidence; and (2) the district court abused its discretion by admitting irrelevant or unfairly prejudicial evidence at trial.  For the reasons set forth below, we affirm Durham's conviction.

## I.

On May 16, 2011, at 4:18 p.m., George Roe, an Alabama State Trooper, observed Durham change lanes on his motorcycle without signaling, and initiated a traffic stop.  After issuing a warning citation at 4:35 p.m., Trooper Roe and his partner, Trooper Brandon Christian, discussed the circumstances surrounding the traffic stop and conducted a protective pat-down search.  Shortly thereafter, at 4:39 p.m., Durham consented to the search of his motorcycle, which revealed a set of brass knuckles, some buckshot, and a homemade "shotgun type" weapon.

A federal grand jury returned a three-count indictment, charging Durham with being a felon in possession of ammunition, possessing an unregistered firearm, and possessing a firearm that was not identified by a serial number. Durham filed a motion to suppress evidence, arguing that Trooper Roe lacked reasonable suspicion to justify his "continued detention" during the stop.

At the suppression hearing, Trooper Roe testified to the circumstances

surrounding the traffic stop.  Once he initiated the stop, Trooper Roe noticed that

Durham was wearing clothing with "Pistolaros" insignia, and based on Trooper

Roe's training and experience, he knew that "the Pistolaros and Bandidos" were

motorcycle clubs known for "violence, guns, drugs, [and] several felony type

criminal activities."  Trooper Roe asked Durham to wait in the patrol car during

the license and registration check, and before they entered the car, Durham

admitted to possessing several knives, which Trooper Roe allowed him to keep.

Trooper Roe and Durham then engaged in "general conversation," and Durham

indicated that he was on his way to attend a motorcycle club meeting about

upcoming bike rides and charity events.  After Trooper Roe asked Durham about

the meeting location, Durham became "serious," and began to mention the names

of other law enforcement officers that Trooper Roe might know.

After issuing and explaining the traffic citation, Trooper Roe asked Durham

to "hold tight" while he spoke to his partner for "just a second."  Trooper Roe

advised Trooper Christian of his "suspicion[s]," including that "[Durham]

shutdown and changed his tone of voice" after questions about the meeting

location, and his motorcycle club was "notorious for criminal activity."  Trooper

Roe expressed concern that, after speaking openly about his club's charity work,

Durham was secretive about other issues and began to "name drop."  Further,

3

Durham's vest indicated that he was the Pistolaros's "Sergeant-at-Arms," a person who normally carries weapons to "keep the peace" among the motorcycle clubs. Trooper Roe continued the traffic stop based on these concerns.

Durham argued that the traffic stop was unlawfully extended because he was detained for longer than was required to effectuate the purpose of the traffic stop. He should have been free to leave when the traffic citation was completed. After the pat down search at 4:37 p.m., there was no reasonable suspicion to justify his continued detention, and accordingly, Durham's consent to the search of his motorcycle at 4:39 p.m. was not valid.

The district court denied the motion to suppress. The court found that Trooper Roe testified credibly. As to the stop's duration, the court found that Trooper Roe needed from 4:18 p.m. to 4:35 p.m. to issue the traffic citation. Further, Durham's detention for "about a minute" while Trooper Roe spoke with Trooper Christian was not an unreasonable extension of the traffic stop. Trooper Roe had a reasonable suspicion to ask more questions based on his belief that Durham was the Sergeant-at-Arms of a motorcycle club that was believed to be involved in dangerous activity. Further, Trooper Roe's knowledge that Durham was on his way to a meeting of the club and that Durham would speak freely about everything except the meeting's location also supported his reasonable suspicion.

4

Because Durham was not unlawfully detained, his consent to the search was valid.

Durham filed a pre-trial motion to exclude evidence under Fed.R.Evid. 402, 403, and 404.  Specifically, he requested the exclusion of any evidence regarding his affiliation with the Pistolaros or Bandidos, as well as any evidence that he possessed knives and brass knuckles at the time of his arrest.  His membership in a motorcycle club was irrelevant under Rule 402, or alternatively, under Rule 403, its probative value was outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury.  Also, any testimony referring to the Pistolaros or Bandidos as a motorcycle "gang" should be excluded under Rule 404 because of the public perception that gang members possess firearms.  Finally, under Rule 403, Durham's legal possession of knives and brass knuckles was not probative of whether he knowingly possessed the ammunition or firearm.

At trial, the court found that Durham's motion was untimely, but nonetheless, the court indicated that evidence of the brass knuckles was relevant because they were found in the same bag as the firearm and ammunition.  Further, Durham's Sergeant-at-Arms badge was relevant to his motive for possessing a gun.  However, evidence of Durham's knife possession was not relevant to the issues at trial.  In response, Durham indicated that he would stipulate to knowingly possessing the homemade weapon but not the shotgun shells.

5

At the outset of trial, Durham stipulated to his prior felony conviction. Trooper Roe's trial testimony was substantially similar to his suppression hearing testimony, except that he did not testify at trial regarding his knowledge of the Pistolaros or the Sergeant-at-Arms position. During trial, the court admitted evidence over Durham's objection, including: (1) a photo of him wearing badges stating, "I support Bandidos MC Worldwide" and "SGT AT ARMS;" (2) a video clip that included Durham's reference to his "blade;" (3) a video clip during which one of the troopers referenced the brass knuckles and stated that a "Sergeant-at-Arms" keeps the peace; (4) evidence showing that the brass knuckles were recovered with the other items in saddlebags; and (5) the actual brass knuckles.

As to the evidence of Durham's knife possession, the video showed that just before entering the patrol car, Durham placed his hand on his jacket and said, "What about my blade here?" Trooper Roe responded, "That's fine, as long as you don't pull it." After confirming that the clip did not show Durham with any knives, the court found that the clip was "pretty innocuous."

At the close of the government's evidence, the court denied Durham's request for a limiting instruction regarding the challenged evidence. The jury found Durham guilty of being a felon in possession of ammunition, but the jury was deadlocked on the two firearm counts. The government dismissed those

6

charges, and Durham received a 15-month sentence.

## II.

We review a district court's denial of a motion to suppress as a mixed question of law and fact. *United States v. Spoerke*, 568 F.3d 1236, 1244 (11th Cir. 2009). Rulings of law are reviewed *de novo*, while the district court's findings of fact are reviewed for clear error, in the light most favorable to the prevailing party in the district court. *Id*. We afford considerable deference to the district court's credibility determinations because it is "in a better position than the reviewing court to assess the credibility of witnesses." *United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002). The version of events adopted by the district court must be accepted "unless it is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it." *Id.*

The Fourth Amendment protects individuals from unreasonable searches and seizures. *United States v. Harris*, 526 F.3d 1334, 1337 (11th Cir. 2008); U.S. Const. amend IV. When police stop a motor vehicle, even for a brief period, a Fourth Amendment "seizure" occurs. *Whren v. United States*, 517 U.S. 806, 809-10, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89 (1996). Following a traffic stop, the officer's investigation "must be reasonably related in scope to the circumstances which justified the interference in the first place." *United States v.*

7

*Ramirez*, 476 F.3d 1231, 1236 (11th Cir. 2007) (quotation omitted).  Also, "the duration of the traffic stop must be limited to the time necessary to effectuate the purpose of the stop."  *Id.* (quotation omitted).  Nevertheless, an officer may detain an individual for further investigation unrelated to the initial purpose of the stop in two situations: (1) where the officer "has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring;" and (2) where "the initial detention has become a consensual encounter."  *Id.* at 1237 (quotations omitted).

In determining whether a reasonable suspicion exists, we must look at the totality of the circumstances to ascertain "whether the detaining officer ha[d] a particularized and objective basis for suspecting legal wrongdoing."  *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 750, 151 L.Ed.2d 740 (2002) (quotation omitted).  Officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person."  *Id.* at 273, 122 S.Ct. at 750-751 (quotation omitted).  "Also, a reasonable suspicion of criminal activity may be formed by observing exclusively legal activity."  *United States v. Lindsey*, 482 F.3d 1285, 1290 (11th Cir. 2007).

Finally, a defendant's consent to a search may cure the constitutional taint

8

of a Fourth Amendment violation. *United States v. Chanthasouxat*, 342 F.3d 1271, 1280 (11th Cir. 2003). However, the government must prove that the consent was voluntary and that it was obtained "by means sufficiently distinguishable from the illegal stop to be purged of the primary taint." *Id.* (alteration omitted). "We consider three factors in determining whether a voluntary consent was obtained by exploitation of an illegal seizure: (1) the temporal proximity of the illegal conduct and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the initial misconduct." *Id.* Although not in the context of a traffic stop, we recently applied these factors in *United States v. Welch*, 683 F.3d 1304, 1307-08 (11th Cir. 2012), to determine whether a defendant's consent was tainted by illegal police actions. In concluding that the consent was not tainted, we explained that, although the police officers' initial entry into the defendant's home was unlawful, they did not enter for the express purpose of gaining consent for a search, and once inside, they did not act "'flagrantly." *Welch*, 683 F.3d at 1308. In *Welch*, "timing [was] not the most important factor," as we decide "whether consent was tainted by illegality with a pragmatic evaluation of the extent to which the illegal police conduct caused the defendant's response, not with a stopwatch." *Id.* (quotation omitted).

The district court did not err in finding that Durham was lawfully detained

9

at the time when he consented to the search because Trooper Roe had a reasonable suspicion of criminal activity sufficient to support the brief extension of the traffic stop. We give deference to the district court's factual finding that Trooper Roe testified credibly. *See Ramirez-Chilel*, 289 F.3d at 749. During the suppression hearing, Trooper Roe stated that he believed, based on his training and experience, that Durham's motorcycle club was "notorious" for criminal activity, involving violence, firearms, and drugs. Further, Trooper Roe believed that Durham's designation as Sergeant-at-Arms of the Pistolaros and his knife possession also indicated that he might possess other weapons for protection of the club's members. Although Durham legally possessed the knives, legal conduct may support a reasonable suspicion of criminal activity. *Lindsey*, 482 F.3d at 1290.

Trooper Roe was also suspicious because Durham's demeanor changed after he was asked about the Pistolaros's meeting location. Although Durham disputes that his demeanor changed or that his behavior was suspicious, Trooper Roe's testimony regarding his impression of Durham's behavior was not "contrary to the laws of nature" or so inconsistent or improbable that no reasonable factfinder could accept it, and as such, we defer to the district court's credibility determination. *See Ramirez-Chilel*, 289 F.3d at 749. Durham also argues that "name-dropping" does not objectively suggest that he was involved in criminal

10

activity. However, in view of the totality of the circumstances, even absent the name-dropping, Trooper Roe had an objectively reasonable suspicion that Durham may have been involved in criminal activity related to the Pistolaros, and as such, Trooper Roe was permitted to investigate further after issuing the traffic citation. *Ramirez*, 476 F.3d at 1236-37; *Arvizu*, 534 U.S. at 273, 122 S.Ct. at 750.

Even assuming *arguendo* that Durham's continued detention was a Fourth Amendment violation, his subsequent, voluntary consent cured any taint from the illegal detention. *See Chanthasouxat*, 342 F.3d at 1280. Although only four minutes elapsed between the alleged illegal detention and Durham's consent, no evidence suggested that Troopers Roe and Christian acted "flagrantly" or in a threatening manner toward Durham. *See Welch*, 683 F.3d at 1308. Further, evidence showed that Trooper Roe's purpose in detaining Durham after writing the traffic citation was to discuss the circumstances of the traffic stop with Trooper Christian and to conduct a protective pat-down search, not to obtain consent for a search of the motorcycle. *See id.* After the pat-down search, Durham agreed to the search of his motorcycle, and nothing suggests that his consent was caused by his allegedly unlawful detention.

## III.

We review the district court's evidentiary rulings for abuse of discretion.

11

*United States v. Baker*, 432 F.3d 1189, 1202 (11th Cir. 2005).  Further, we review preserved evidentiary objections for harmless error.  *Id.*  Under harmless error analysis, "[r]eversal is warranted only if the error resulted in actual prejudice because it had substantial and injurious effect or influence in determining the jury's verdict."  *United States v. Phaknikone,* 605 F.3d 1099, 1109 (11th Cir.) *cert. denied*, 131 S. Ct. 643 (2010) (quotations and alteration omitted).

Relevant evidence is admissible, unless otherwise excluded.  Fed.R.Evid. 401, 402.  Rule 403 provides that relevant evidence may be excluded if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, or misleading the jury.  Fed.R.Evid. 403.  "Rule 403 is an extraordinary remedy, which should be used only sparingly."  *United States v. Smith*, 459 F.3d 1276, 1295 (11th Cir. 2006) (quotation and alteration omitted). Thus, we view the evidence "in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact."  *Id.* (quotation omitted).

Rule 404(b) provides that evidence of "a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," but such evidence may be admissible for another purpose, such as proving motive, intent, or

12

knowledge.  Fed.R.Evid. 404(b).  However, Rule 404(b) does not apply to evidence that is "not extrinsic."  *United States v. Edouard*, 485 F.3d 1324, 1344 (11th Cir. 2007).  Evidence is "not extrinsic" when it is "inextricably intertwined with the evidence regarding the charged offense."  *Id.*  Thus, "Rule 404(b) does not exclude evidence that is linked in time and circumstances with the charged crime or that forms an integral and natural part of an account of the crime to complete the story of the crime for the jury."  *United States v. McNair*, 605 F.3d 1152, 1203 (11th Cir.) (citations omitted), *cert. denied*, 131 S.Ct. 1600 (2011).

The district court did not abuse its discretion by admitting evidence of the brass knuckles, which were discovered in the same saddlebags with the ammunition and homemade firearm.  Evidence that Durham possessed brass knuckles was probative of his intent to possess the homemade firearm and ammunition because all three items were found together in Durham's saddlebags on the day of his arrest.  Further, the brass knuckles were not unfairly prejudicial because Durham stipulated to being a convicted felon and the only issues at trial were whether he knew that he possessed ammunition and whether he knew that the homemade weapon qualified as a shotgun.  Evidence of the brass knuckles was no more prejudicial than evidence that Durham was a convicted felon, who was found in possession of shotgun shells and a homemade weapon.  Viewing evidence of

13

the brass knuckles in a light most favorable to its admission, Durham has not established that the district court abused its discretion by failing to exclude the brass knuckles under Rule 403. *See Smith*, 459 F.3d at 1295. Moreover, Rule 404(b) does not apply to the brass knuckles because they were "not extrinsic." *See Edouard*, 485 F.3d at 1344. Specifically, the brass knuckles were linked in time and circumstances with the charged offenses because they were found in the same bag as the ammunition and firearm.

To the extent that the district court abused its discretion in admitting evidence of Durham's designation as "Sergeant-at-Arms," his Bandidos affiliation, and his knife possession, any error was harmless. As to error, Durham's affiliation with the Bandidos and his designation as "Sergeant-at-Arms" do not appear to have been relevant to or probative of his knowing possession of the ammunition or firearm. The only evidence admitted at trial of Durham's club affiliation was a photo of him wearing badges on his vest, stating "I support the Bandidos MC Worldwide" and "SGT AT ARMS." Other than a comment by one of the arresting officers that a Sergeant-at-Arms keeps the peace, no evidence was presented to the jury regarding the duties of such a position or the Bandidos's reputation for criminal activity. Trooper Roe testified to these issues during the suppression hearing, but not at trial. Further, the district court agreed that evidence of

14

Durham's knife possession was not relevant, but found that his brief mention of a "blade" was innocuous.  Specifically, the court admitted a video clip showing that, just before he entered the patrol car, Durham patted his jacket and asked Trooper Roe what to do with his "blade," and Trooper Roe responded that it was "fine" as long as he did not "pull it."

Nonetheless, to the extent that this evidence should have been excluded as irrelevant, or under Rule 404(b) as improper character evidence, any error was harmless because it did not appear to have a substantial or injurious effect on the jury's verdict.  *See Phaknikone,* 605 F.3d at 1109.  No evidence was presented regarding the Bandidos's reputation for criminal activity or the specific duties of a "Sergeant-at-Arms," and the district court excluded evidence of the actual knives that Durham possessed.  Further, the jury could have viewed Durham's admission that he possessed a "blade" prior to entering the patrol car favorably because it could have suggested that Durham would have admitted to any other dangerous items that he knew he possessed.  The jury's inability to reach a verdict as to the firearm charges further suggests that the challenged evidence did not have a substantial effect on its verdict regarding the ammunition charge.

For the foregoing reasons, we affirm Durham's conviction.

**AFFIRMED.**

15