[Cite as *State v. Jones*, 2021-Ohio-3050.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28977 |
| | : | |
| v. | : | Trial Court Case No. 2019-CR-1801 |
| | : | |
| WILLIAM D. JONES | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 3rd day of September, 2021.

. . . . . . . . . . .

MATHIAS H. HECK, JR. by ELIZABETH A. ELLIS, Atty. Reg. No. 0074332, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
     Attorney for Plaintiff-Appellee

MATTHEW M. SUELLENTROP, Atty. Reg. No. 0089655, 6 North Main Street, Suite 400, Dayton, Ohio 45402
     Attorney for Defendant-Appellant

. . . . . . . . . . . .

EPLEY, J.

{¶ 1} Defendant-Appellant William D. Jones was found guilty by a jury of multiple counts of rape, aggravated burglary, aggravated robbery, and kidnapping (all with attendant firearm specifications), and he was sentenced to an aggregate prison term of 39 years. On appeal, Jones argues that the trial court erred in overruling a motion to suppress evidence, that it erred in overruling a motion in limine, that it erred by failing to give an Evid.R. 404(B) jury instruction, and that the court should have granted a mistrial due to juror misconduct. For the reasons that follow, the judgment of the trial court will be affirmed.

## I.       Facts and Procedural History

### The rape of A.W.

{¶ 2} In December 2018, A.W. and her daughter lived in a one-story, three-bedroom house on Curundu Avenue in Trotwood. Trial testimony indicated that on the evening of December 2, 2018, A.W. spent the evening at home with her boyfriend watching television, drinking alcohol, and smoking marijuana. They engaged in consensual oral sex, and then A.W.'s boyfriend left around 11 p.m.

{¶ 3} A.W. fell asleep alone in her bed and was awakened by someone tapping on her leg. She realized there was an intruder crouching at the end of her bed with a silver gun pointed at her. While the lights were out in her bedroom, lights had been left on in the living room, allowing her to determine the color of the firearm. A.W. also realized that her daughter had crawled into bed with her and was sleeping beside her.

{¶ 4} The man ordered A.W. out of bed and led her down the hallway at gun point. A.W. testified that she was scared and repeatedly begged for her life. In an effort to

placate the intruder, she offered him money. As he passed from behind her to in front, A.W. was able to get a good look at the man. She testified that he had dark skin and had "distinctive" eyebrows; most of his face, though, was covered. According to A.W., he also had a voice that sounded like a young man or a teenager.

{¶ 5} Now in the area of the kitchen, the intruder exposed his penis, which was erect with a condom already on. He commanded A.W. to perform oral sex on him. Noticing that the back door was slightly ajar, and sensing a possible way to escape, A.W. suggested they go out onto the back porch. The intruder agreed and they proceeded outside.

{¶ 6} Before engaging in oral sex, A.W. begged the man to take the clip out of his gun because she was afraid he would shoot her while in the act. He took the bullets out of the gun, but once the ammunition was out, the man changed his mind – he no longer wanted oral sex, he now wanted to have vaginal intercourse. He then led A.W. back in the house and into the kitchen, where he forced her over the table and vaginally penetrated her with his penis. As this was happening, A.W. noticed he was wearing gloves with lines on them. Once the intruder finished, he asked A.W. for money. She handed over her bank card and pin, but he did not take it. As he left, the man told her to lock the door.

{¶ 7} As soon as the intruder was gone, A.W. grabbed her daughter from the bed and hid her in the closet because she was afraid the man would return. She then called her friend Anastasia, who immediately came over and spent the rest of the night with her. The next morning (December 3, 2018), A.W. told her siblings and they took her to the Trotwood Police Department; she made a statement and then went to the hospital to get

an exam from a Sexual Assault Nurse Examiner (a SANE nurse).

{¶ 8} Later, investigators found two condom wrappers outside her residence. A gold Trojan Magnum wrapper was located right outside her bedroom window, and the silver wrapper of a different brand (Durex) was found near where she deposited her trash. A.W. testified that she and her boyfriend use Durex condoms, not Magnum.

The rape of I.J.

{¶ 9} On December 5, 2018, I.J. lived on Runyon Avenue in Trotwood with her dogs in a one-story, three-bedroom house. About 10:45 p.m., after a short visit from her boyfriend, I.J. fell asleep watching television. Around 11 p.m., she was awakened by her dogs barking and heard her bedroom door open. Being legally blind (although she had some vision in one of her two eyes), I.J. called out, "Babe?," expecting her boyfriend to walk into the room. Instead, a strange man with a gun pointed at her entered and said, "Don't scream and I won't hurt you." Despite her limited vision, I.J. knew there was a gun because of the way the intruder was holding the object. She immediately began to cry and beg for mercy.

{¶ 10} The man ordered I.J. out of bed and demanded that she remove her clothes. She complied and then walked toward him per his command. The intruder then reached into his pocket, pulled out a bottle, and dumped some pills into his gloved hand. He told I.J. to swallow the pills. Having serious health issues and being completely unaware of what she had just been handed, I.J. protested. The man assured her the pills would not hurt her, only keep her awake.

{¶ 11} She took the pills from his gloved hand and went to the bathroom to wash them down with water; the man followed behind her. After a few seconds in the bathroom,

she was escorted back to the bedroom where the intruder forced her to perform oral sex on him. I.J. testified that he did not pull his pants all the way down and that he already had a condom on, although she testified that the intruder had trouble keeping an erection. Being in proximity, she noticed that the intruder's face was mostly covered, but I.J. could tell he had dark skin. She also testified that he sounded "really young."

{¶ 12} After I.J. performed oral sex, the man told her to get on the bed and the two engaged in vaginal intercourse. When he was finished, the man got up off the bed and demanded money. I.J. did not have any cash, so instead she gave him her credit card, a necklace, and a ring. As he left, the intruder told I.J. to lock the windows and warned against calling the police.

{¶ 13} After the perpetrator left, I.J. called her friend Samuel, who arrived almost immediately as he lived only a short distance from her home. He then called 911 and told the dispatcher that I.J. had been raped and given pills. Police and medics arrived, and I.J. was transported to Miami Valley Hospital North. There, she had a sexual assault exam and had her stomach pumped to purge the pills that had been forced on her. A toxicology screening later showed that I.J. had tramadol metabolites, fentanyl, norfentanyl, morphine, and lorazepam in her system.

{¶ 14} Trotwood police officers were dispatched to I.J.'s residence just before 1 a.m. on December 5, 2018. Officer Roger Hoff testified that a canine unit was deployed to track down the perpetrator. The dog tracked to a house in the same neighborhood, but no one would respond to the knocking of the officers. Officer Hoff also testified that he located a gold Trojan Magnum condom wrapper on the floor just below a bedroom window that I.J. believed was the point of entry. He photographed it, collected it, and the evidence

was sent to the lab for DNA testing. Like A.W., I.J. testified that she did not use that brand of condom.

### January 4, 2019 Curundu Avenue burglary

{¶ 15} A month after the first incident at A.W.'s home, Trotwood police were once again dispatched to her Curundu Avenue residence after A.W. returned home one evening to find the window of her daughter's bedroom wide open. When officers arrived, they discovered that the metal security bars that covered the bedroom window and the kitchen window had been partly pried off and the security camera that had been installed on the outside of her daughter's bedroom window had been taken. Officers dusted for fingerprints and attempted to collect DNA evidence from the scene.

### Trotwood Police investigation

{¶ 16} Detective Natalie Watson, an 18-year veteran of the Trotwood Police Department, led the investigation. Watson spoke with both victims shortly after the incidents, and while both women were able to give only vague physical descriptions of their assailants, similarities in the crimes emerged: the women were home alone, the suspect was a young black male, both were awakened from sleep, the suspect had a gun, the suspect already had a condom on, he demanded money, he told them to lock up after he left, and gold Magnum condom wrappers were found in both locations. Based on those similarities, Detective Watson believed there was only one suspect. She also believed that the suspect lived in the same neighborhood as A.W. and I.J. A.W.'s address, I.J.'s address, and 4460 Curundu (the house the canine tracked the suspect to) were all in the Salem Village neighborhood. Detective Watson testified that there were other, similar crimes reported in Salem Village around that time as well.

{¶ 17} Based on that evidence, Trotwood Police began targeted patrols in the neighborhood. Officers got word from neighbors that William Jones may be someone of interest; on December 10, 2018, officers located him on Nevada Avenue in the Salem Village neighborhood and brought him to the police station for an interview. Nothing in the record gives any indication of the voluntariness or involuntariness of this initial encounter.

{¶ 18} Once at the police station, Jones was taken – un-handcuffed – into an interview room where he spoke with Detective Watson for approximately 30 minutes. He was not *Mirandized* during this interaction but did consent to having his DNA collected. After the buccal swab was completed, officers returned Jones to Salem Village. His DNA was submitted to the Bureau of Criminal Investigation (BCI) to be compared with evidence from other cases, specifically to items collected from the homes of A.W. and I.J.

{¶ 19} After forensic analysis, it was determined that the DNA sample obtained from Jones during his December 10, 2018 interview matched DNA found on the gold Magnum condom wrapper found at I.J.'s house. It was also determined that the Magnum condom wrappers found at both rape scenes were of the same lot number. On January 7, 2019, law enforcement picked up Jones from Meadowdale High School and transported him back to the Trotwood police station for a follow-up interview with Detective Watson and others. This time he was *Mirandized* and agreed to speak with detectives.

{¶ 20} During the lengthy interview, Jones admitted to detectives that he recently had sex with three women in the Salem Village neighborhood, but he could not recall their names. When asked if A.W.'s name sounded familiar, Jones stated that it did. He did not, however, remember I.J.'s name. Detective Watson then showed him pictures of A.W.'s

house, and Jones admitted to having sex with the woman who lived there. In fact, he recalled having sex in the kitchen at the Curundu address and added that the woman was high on marijuana at the time. Jones was then shown a picture of I.J.'s house, and while he stated that he was not sure if he had had sex at that particular house, he admitted that he did have sex with a female on Runyon, and remembered that she had dogs. He also noted that there was a couch by the front door at the house, a set-up that was like I.J.'s family room.

{¶ 21} Detective Watson also asked if Jones was familiar with the house to which the canine unit led officers on the night of I.J.'s rape. Jones admitted that he knew the men who lived there and said he "used to be cool with them." He also noted that he had raked leaves for them in the past.

{¶ 22} At the end of the nearly three-and-a-half-hour interview, Jones was arrested. Based on what they learned from Jones on January 7, investigators were able to obtain a search warrant for his home, which was also in the Salem Village neighborhood. Among other items, officers found gold Magnum condom wrappers next to Jones's bed.

Court proceedings

{¶ 23} A criminal complaint was filed in juvenile court on January 8, 2019; Jones was 16 years old at the time. He was bound over to the Montgomery County Court of Common Pleas, General Division, on May 30, 2019, and he was indicted on 13 counts, all first-degree felonies. All the counts had firearm specifications attached.

{¶ 24} For the assault against A.W., Jones was charged with: Count 1 – aggravated burglary (physical harm); Count 2 – aggravated burglary (deadly weapon);

Count 3 – rape (force); Count 4 – kidnapping (sexual activity); Count 5 – kidnapping (commission of a felony); and Count 6 – aggravated robbery (deadly weapon).

{¶ 25} For the crimes committed against I.J., Jones was charged with: Count 7 – aggravated burglary (deadly weapon); Count 8 – aggravated burglary (physical harm); Count 9 – rape (force); Count 10 – rape (force); Count 11 – kidnapping (sexual activity); Count 12 – kidnapping (commission of a felony); and Count 13 – aggravated robbery (deadly weapon).

{¶ 26} On July 15, 2019, Jones filed a motion to suppress the evidence gained from his police interviews on December 10, 2018, and January 7, 2019. On September 9, 2019, the court conducted a hearing on the matter at which Detective Watson testified for the State. The trial court ultimately sustained the motion to suppress as to the statements Jones made during his December 2018 interview, finding that he was in custody at the time of the interview and was not *Mirandized*. The court, however, overruled the motion to suppress the DNA, finding that Jones voluntarily consented to the buccal swab. It also overruled the motion to suppress as to the statements made during Jones's January 2019 interview, finding that he voluntarily waived his rights and consented to speak with detectives on that occasion.

{¶ 27} The case proceeded to a jury trial on September 28, 2020. The trial, which lasted five days and included testimony from 14 witnesses, was not without complications. In addition to logistical difficulties sparked by COVID precautions and protocols, the trial was marked by issues caused by Juror #9. After three separate episodes over the course of the first four days of trial, Juror #9 was dismissed and replaced by an alternate. Ultimately, Jones was convicted of all charges and specifications and was sentenced to

a total of 39 years in prison. He appeals, raising four assignments of error.

## II.    Suppression Issues

{¶ 28} In his first assignment of error, Jones argues that the trial court committed plain error when it overruled his motion to suppress evidence. His principal argument is that all of the evidence against him obtained from his interviews with Trotwood detectives – both his statements and the DNA evidence – should have been excluded from trial because he had been illegally detained and placed into custody prior to his first interview on December 7, 2018. The conclusion reached by Jones is that everything after his allegedly unlawful seizure was fruit of the poisonous tree, although he only specifically challenges the court's decision not to exclude the DNA evidence acquired on December 7.

{¶ 29} An appeal from a ruling on a motion to suppress presents a mixed question of facts and law. *State v. Ojezua*, 2016-Ohio-2659, 50 N.E.3d 14, ¶ 15 (2d Dist.). The weight of the evidence and the credibility of the witnesses at a suppression hearing are primarily for the trial court to determine. *State v. Brinkley*, 105 Ohio St. 3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 58.  In reviewing a trial court's decision on a motion to suppress, an appellate court accepts the trial court's factual findings and relies on its ability to assess the credibility of witnesses, but it independently determines whether the trial court applied the proper legal standard to the facts as found. *State v. Hurt*, 2d Dist. Montgomery No. 21009, 2006-Ohio-990, ¶ 16. That legal determination requires an independent review, without deference to the trial court's conclusions. *State v. Bissaillon*, 2d Dist. Greene No. 06-CA-130, 2007-Ohio-2349, ¶ 8. In this case, before we can determine whether the trial court reached the correct suppression conclusion, we must

first examine the circumstances surrounding Jones's initial interview with Detective Watson.

Jones's initial encounter with law enforcement

{¶ 30} After speaking with A.W. and I.J. in the days following their rapes, Detective Watson determined that the perpetrator likely lived or spent time in the Salem Village neighborhood. As such, she ordered Trotwood officers to conduct targeted patrols in the area. The record indicates that neighbors approached officers and shared with them their belief that Jones may have been involved in the crimes. As a result, on December 7, 2018, patrol officers located Jones walking on Nevada Avenue in the Salem Village area and brought him to the Trotwood police headquarters to speak with Detective Watson.

{¶ 31} While it is clear where and when Jones came into contact with law enforcement officers, very few other details are known about that encounter. In fact, there is almost a complete gap in the record until Detective Watson arrived in the interview room to find Jones sitting at the table waiting for her. Jones characterizes his initial interaction with Trotwood officers as an illegal seizure – going as far, in his reply brief, as to characterize the situation as "nothing short of kidnapping," or a "tyrant disposing of a critic." Notwithstanding this rhetoric, a determination must be made as to whether Jones was seized.

{¶ 32} A person has been seized for the purposes of the Fourth Amendment when a law enforcement officer, by means of physical force or show of authority, has in some way restrained his or her freedom such that a reasonable person would not feel free to walk away. *United States v. Mendenhall*, 446 U.S. 544, 553, 100 S.Ct.1870, 64 L.Ed.2d 497 (1980). *See also State v. Retherford,* 93 Ohio App.3d 586, 595, 639 N.E.2d 498 (2d

Dist.1994). "Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards. The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but to 'prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.' " *State v. Cookson*, 4th Dist. Washington No. 00CA53, 2001 WL 1155710, *8 (Sep. 25, 2001), quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 554, 96 S. Ct. 3074, 49 L.Ed.2d 1116 (1976).

{¶ 33} Interactions between citizens and police officers take one of three forms: consensual encounters, investigatory detentions, and arrests. *State v. Millerton*, 2015-Ohio-34, 26 N.E.3d 317, ¶ 20 (2d Dist.). An "encounter between a police officer and a member of the public is consensual if a reasonable person would feel free to disregard the officer's questions or [to] terminate the encounter and go about his * * * business." *Columbus v. Beasley*, 2019-Ohio-719, 132 N.E.3d 1201, ¶ 41 (10th Dist.). The determination of whether a consensual encounter occurred should focus, not on the state of mind of the person having the encounter, but rather on the conduct of the officers involved. *State v. Penwell*, 2021-Ohio-1216, __ N.E.3d __, ¶ 12 (2d Dist.). A consensual encounter stays consensual even if the officers ask questions, ask for identification, or search belongings so long as they do not convey the message that compliance is required. *Id.* at ¶ 11.

{¶ 34} On the other hand, a person is subject to an investigatory detention when, in view of all the circumstances, a reasonable person would believe that he or she is not free to leave. *Penwell* at ¶ 10. Factors that might indicate a person's interaction with officers is an investigatory detention (as opposed to a consensual encounter) include the

"threatening presence of several police officers, the display of a weapon, some physical touching of the person, the use of language or tone of voice indicating that compliance with the officer's request might be required, approaching the person in a nonpublic place, and blocking the [person]'s path." *State v. Cosby*, 177 Ohio App.3d 670, 2008-Ohio-3862, 895 N.E.2d 868, ¶ 13 (2d Dist.).

{¶ 35} In Jones's case, the record is almost silent as to the details of his initial encounter with Trotwood police on December 10, 2018. The only information in the record on this event comes from Detective Watson's testimony at the suppression hearing. She stated that she was not present when Jones was picked up on Nevada Avenue by the patrol officer(s), but she did not think he was handcuffed. Detective Watson also testified that Jones was not under arrest when he arrived at the station and spoke with her. The trial court's suppression decision does not provide much further guidance, only finding that "Jones was brought to the Trotwood Police Department by uniformed law enforcement officers after being picked up off the street" and "[t]here is no evidence that Jones was handcuffed during the transport to or at the Trotwood Police Department."

{¶ 36} Based on the limited record before us, we cannot say that Jones was unlawfully detained or seized when he met officers on Nevada Avenue on December 10, 2018. The little information we do have – contact was made on a public street and Jones was not handcuffed or under arrest – weighs in favor of a consensual encounter.

<u>December 10, 2018 interview</u>

{¶ 37} Having determined that Jones's initial encounter with police on December 10 was not an unlawful detention or seizure, we turn now to the trial court's suppression decision. As stated above, appellate review of a decision on a motion to suppress gives

deference to the trial court's factual findings, but independently reviews conclusions of law. *See Bissaillon,* 2d Dist. Greene No. 06-CA-130, 2007-Ohio-2349, at ¶ 8. Jones argues that the trial court erred by finding that he voluntarily consented to the buccal swab and search of his DNA. We disagree.

**{¶ 38}** "A defendant waives his or her Fourth Amendment protection by consenting to a search, provided the consent is voluntary." *In re Parks*, 10th Dist. Franklin No. 04AP-355, 2004-Ohio-6449, ¶ 20. *See also State v. Ojezua,* 2016-Ohio-2659, 50 N.E.3d, ¶ 17 (2d Dist.). This bedrock principle also applies to juveniles. The voluntariness of a consent to search is a question of fact to be determined from all the surrounding circumstances. *State v. Adams,* 2017-Ohio-7743, 97 N.E.3d 1137, ¶ 14 (2d Dist.). *See Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The State bears the burden of proving that the defendant's consent was "freely and voluntarily given." *Retherford,* 93 Ohio App.3d at 596, 639 N.E.2d 498, quoting *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). The government's burden has not been met when all it has proven is "mere submission to a claim of authority." *Id.*

**{¶ 39}** Courts consider six factors when determining whether consent was freely and voluntarily given: (1) whether the defendant's custodial status was voluntary; (2) whether coercive police procedures were used; (3) the extent and level of the defendant's cooperation; (4) the defendant's awareness of his or her right to refuse consent; (5) the defendant's education and intelligence; and (6) the belief of the defendant that no incriminating evidence would be found. *Ojezua* at ¶ 82. The individual need not know that he or she had a right to refuse consent. *In re Parks* at ¶ 22.

**{¶ 40}** Applying the factors to this case, Jones's consent was freely and voluntarily

given. There is no evidence that Trotwood officers or detectives used any coercive tactics to obtain Jones's consent. Detective Watson testified that neither she nor Sergeant Holbrook (who took the buccal swab) made any promises or threats to Jones, and she made clear during her testimony that she did not have her sidearm during the interview. She further recalled that she was up-front with Jones about what she wanted to talk to him about: sexual assaults, burglaries, and voyeurism in the Salem Village area. Jones was also made aware of his right to refuse the DNA search. Detective Watson testified, and the record confirms, that Jones signed the consent form, had no questions about it, and seemed to understand what was contained in the form. The signed consent form further demonstrated Jones's willingness to cooperate. Going beyond that, Detective Watson testified that Jones was informed that he was free to leave at any time, and in fact gave him that opportunity. The detail that he continued the encounter when given the chance to leave bolsters the conclusion that Jones was willing to cooperate with Trotwood police.

{¶ 41} It is also demonstrable that Jones knew he could refuse to consent. The consent form specifically stated: "Knowing my lawful right to refuse to consent to such a search, I willingly give my permission[.]" Additionally, Jones had a ninth-grade education and prior experience with the justice system when he consented to the buccal swab. It is unclear, though, if he believed any incriminating evidence would be found.

{¶ 42} Considering the totality of the circumstances, we conclude, as the trial court did, that Jones freely and voluntarily consented to the DNA swab.

{¶ 43} Nevertheless, Jones argues that the analysis the trial court used to determine that he voluntarily consented to the DNA search was wrong, and that a more

exacting standard should have been used. That premise, though, assumes that his initial encounter with officers amounted to an illegal seizure, a notion we have rejected. However, even if his seizure had been unlawful, Jones's consent would have been valid.

**{¶ 44}** If the defendant consents while illegally detained, the "consent is vitiated unless the government proves that it was not 'the product of the illegal detention,' but the 'result of an independent act of free will.' " (Citations omitted.) *Retherford,* 93 Ohio App.3d at 597, 639 N.E.2d 498. We have stated that "[w]hen consent is obtained after illegal police activity, the consent will be held voluntary only if there is proof of an unequivocal break in the chain of illegality sufficient to dissipate that taint of the prior illegal action." (Citations omitted.) *State v. Adams*, 2017-Ohio-7743, 97 N.E.3d 1137, ¶ 47 (2d Dist.). For the unlawfully-detained person's consent to be considered an independent act of free will, "the totality of the circumstances must clearly demonstrate that a reasonable person would believe that he or she had the freedom to refuse to answer further questions and could in fact leave." *State v. Robinette*, 80 Ohio St.2d 120, 429 N.E.2d 141 (1981), paragraph three of the syllabus.

**{¶ 45}** Factors to consider in determining whether consent is sufficiently removed from the taint of unlawful police activity include "the length of time between the illegal activity and the subsequent search, the presence of intervening circumstances, and the purpose and flagrancy of the misconduct." *Adams* at ¶ 48, quoting *State v. Alihassan*, 10th Dist. Franklin No. 11AP-578, 2012-Ohio-825, ¶ 26. "Though the factors enumerated above provide a useful framework, we must not allow this factor-based analysis to obscure the underlying question, which generally involves a pragmatic evaluation of the extent to which the illegal police conduct caused the defendant's response." (Citations

omitted.) *State v. Barnes*, 2017-Ohio-7284, 96 N.E.3d 969, ¶ 11 (2d Dist.). Several cases demonstrate this concept.

{¶ **46**} In *U.S. v. Delancy*, 502 F.3d 1297 (11th Cir.2007), law enforcement conducted an unlawful protective sweep of a residence, and ten to fifteen minutes later received consent to search the house. Incriminating items were discovered, and the defendant moved for suppression. In deciding that the taint of the unlawful search had dissipated by the time consent was granted, the trial court held that the relatively brief ten to fifteen minute period between the unlawful search and consent weighed in favor of finding that the taint had dissipated. *Id.* at 1310-1311. The court also concluded that brief period of time between the protective sweep and consent militated in favor of dissipation because the person who gave consent "was not handcuffed or detained" and because "the district court found that the interaction was conversational in tone, and that the officers did not threaten [the defendant's girlfriend who consented] in any way." *Id.* at 1311. The court also determined that the girlfriend's reviewing and signing of the consent form was an important intervening circumstance, because it informed her of her constitutional rights. *Id.* Finally, in examining whether the police conduct was flagrant, the court found that factor also weighed in favor of finding that the taint of the unlawful entry dissipated, because the girlfriend was not handcuffed and never had a weapon pointed at her. *Id.* at 1312-1313.

{¶ **47**} In *State v. Barnes*, 2017-Ohio-7284, 96 N.E.3d 969 (3d Dist.), police executed an arrest warrant at Barnes's residence. After the arrest, a law enforcement officer went back into the house – without permission and without a search warrant – and spoke to Barnes's mother, who also lived there and who consented to a search of the

premises. That search resulted in weapons and drugs being located.

{¶ 48} The *Barnes* court, like in *Delancy*, concluded that the taint of the unlawful search had dissipated by the time consent was granted. A brief period of ten minutes separated the entry from Barnes's mother signing the consent form, and the court found that was enough of a break to satisfy the time requirement. *Id.* at ¶ 27. The court also noted that Barnes's mother was coherent and was not handcuffed, threatened, or coerced. *Id.* She reviewed the consent form which informed her of her rights, attested to the fact that she voluntarily consented, and made clear that she could refuse consent. *Id.* Finally, the *Barnes* court concluded that the police action was not flagrant, as the record indicated that law enforcement conducted themselves in a professional manner once they entered the home. *Id.*

{¶ 49} The facts in this case dictate a similar result. As to the first factor (the length of time between the illegal activity and the subsequent search), we estimate that approximately 30 minutes passed between when Jones was picked up in the Salem Village neighborhood and when he consented to the buccal swab. Detective Watson testified that the consent and search was the culmination of their interaction at the Trotwood police station, which lasted a total of approximately 30 minutes. Jones also had to be transported to the station, adding additional time. The approximate 30-minute delay from the alleged unlawful encounter and consent was longer than the examples above and weighed in favor of the taint being sufficiently removed from the consent.

{¶ 50} The explanation and signing of the consent form were the intervening circumstances in this case, satisfying the second factor. Detective Watson testified that she explained the consent form in detail to Jones and that his responses to questions

were appropriate and responsive. She further noted that he had no questions about the form and seemed to understand what was contained in it.

{¶ 51} The final factor, the purpose and flagrancy of the misconduct, also pointed toward voluntariness. Here, assuming for the sake of argument that there was misconduct, it was done for a relatively benign reason – to speak with Jones. As to flagrancy, the record reflects none. Detective Watson testified that she believed Jones had not been handcuffed at any point, that he was informed he was not under arrest and could leave at any time, and that he was given the chance to do so. She also testified that she was not in uniform and did not have her weapon with her during her interaction with Jones.

{¶ 52} We conclude, therefore, after analyzing the pertinent cases and relevant factors, that Jones's consent was an independent act of free will and that he had the freedom to refuse to consent.

{¶ 53} The trial court did not err by overruling Jones's motion to dismiss as to the DNA evidence acquired on December 10, 2018. Jones's first assignment of error is overruled.

### III.    Evidentiary Issues

{¶ 54} In his second assignment of error, Jones argues that the trial court erred in overruling his motion in limine seeking to exclude fingerprint evidence collected by officers at A.W.'s residence in early January 2019.

{¶ 55} The admission or exclusion of relevant evidence is within the sound discretion of the trial court and we review that decision for abuse of discretion. *State v. Jali*, 2d Dist. Montgomery No. 28294, 2020-Ohio-208, ¶ 39. The term "abuse of discretion"

indicates an attitude that is arbitrary, unconscionable, or unreasonable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). It has been previously noted that most abuses of discretion "will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). "A decision is unreasonable if there is no sound reasoning process that would support that decision." *Id.*

{¶ 56} In this case, the evidentiary ruling being challenged by Jones was a motion in limine. A motion in limine is a pre-trial request that certain purportedly inadmissible evidence not be referred to or offered at trial. *Black's Law Dictionary* (11th Ed. 2019). "Typically, a party makes this motion when it believes that mere mention of the evidence during trial would be highly prejudicial and could not be remedied by an instruction to disregard." *Id.*

{¶ 57} The granting or denial of a motion in limine does not determine the admissibility of the questioned evidence. Instead, "it is only a preliminary interlocutory order precluding questions being asked in a certain area until the court can determine from the total circumstances of the case whether the evidence would be admissible." (Citations omitted.) *State v. Grubb*, 28 Ohio St.3d 199, 201, 503 N.E.2d 142 (1986). Hence, "a motion in limine, if granted [or denied], is a tentative, interlocutory, precautionary ruling by the trial court reflecting its anticipatory treatment of the evidentiary issue." *Id.* at 201-202. *Accord State v. Edwards*, 107 Ohio St.3d 169, 2005-Ohio-6180, 837 N.E.2d 751, ¶ 17.

{¶ 58} Because there is no finality, "[a]n appellate court need not review the

propriety of such an order unless the claimed error is preserved by a timely objection when the issue is actually reached during the trial." *State v. Leslie*, 14 Ohio App.3d 343, 344, 471 N.E.2d 503 (2d Dist.1984). *See also Grubb* at 202 (the issuance of a motion in limine, by itself, does not preserve the record on appeal except where the "exclusion of the evidence affects a substantial right and the substance of the excluded evidence is apparent from the context of the questioning by counsel who later seeks to predicate as error the exclusion of the evidence"). It is incumbent on a defendant to seek the introduction of the evidence by proffer to enable the trial court to make a final determination as to its admissibility and preserve an objection for appeal. *Grubb* at 203.

{¶ 59} In this case, Jones did not object to the introduction of the fingerprint evidence at trial and claims that there was "no real opportunity for defense counsel to object at trial and make a proffer" because the evidence was "intertwined with the State's overall theory of the case." We disagree. If the evidence was "intertwined" throughout, defense counsel could have objected at any time. An objection would have been appropriate whenever the fingerprint evidence was referenced or alluded to, such as during opening statements (Trial Tr. at 268); when A.W. testified about the January 4 burglary (Trial Tr. at 437); when Officer Gulley testified to collecting prints from A.W.'s window (Trial Tr. at 754); or when Ashley Owen was certified as a fingerprint expert (Trial Tr. at 773). Another plausible option would have been a standing objection made at any point after the motion in limine ruling. It is also true, as the State points out, that Jones stipulated to the introduction of the evidence. Trial Tr. at 770.

{¶ 60} To overcome that obstacle, Jones contends that he did not need to object at trial because this motion in limine (and its adverse ruling by the court) was the functional

equivalent of a motion to suppress.

{¶ 61} "[A] motion in limine can serve as the functional equivalent of a motion to suppress, which determines the admissibility of evidence with finality." *State v. Johnston*, 2d Dist. Montgomery No. 26016, 2015-Ohio-450, ¶ 16. The difference between a motion to suppress and a motion in limine is that the "former is capable of resolution without a full trial, while the latter requires consideration of the issue in the context of the other evidence." *Id.* at ¶ 17, quoting *State v. Hall*, 57 Ohio App.3d 144, 146, 567 N.E.2d 305 (8th Dist.1989). A motion in limine is treated like a suppression motion when an evidentiary hearing is held at which testimony regarding the topic of the motion is fully presented with cross-examination. *Id.* at ¶ 22.

{¶ 62} Jones's motion in limine was not akin to a motion to suppress, and that is confirmed by the fact that there was not an "adversarial hearing" on the matter and by the trial court's language in its judgment entry. The court wrote:

> The Court finds that the fingerprint evidence *could be admissible*. * * *
> Thus, though the fingerprint evidence may be prejudicial to Jones, *at this time*, the Court does not find the evidence is unfairly prejudicial[.] * * *
> Therefore, *at this time*, the Court hereby overrules Jones' [sic] Motion in Limine #1.

(Emphasis added.) Decision and Entry (Sep. 21, 2020).

{¶ 63} The trial court's use of qualifying language like "could be admissible" and "at this time" reveal that the court had not made a final determination on the matter. Because of the interlocutory nature of the decision, Jones's counsel was required to make an objection on the record during trial to preserve the issue for appeal. That did not

happen, and he has waived all but plain error.

{¶ 64} Plain error arises only when "but for the error, the outcome of the trial clearly would have been otherwise." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph two of the syllabus. "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.* at paragraph three of the syllabus. This is not one of those exceptional circumstances, and we decline to find plain error.

{¶ 65} Jones's second assignment of error is overruled.

### IV.    Jury Instructions

{¶ 66} In his third assignment of error, Jones contends that the trial court erred by failing to give an Evid.R. 404(B) jury instruction.

{¶ 67} "A party may not assign as error the giving or the failure to give any instruction unless he objects thereto before the jury retires to consider its verdict, stating specifically the matter to which he objects and the grounds of his objection." Crim.R. 30. *See also Long* at 94.

{¶ 68} In the case at bar, the trial court gave the proposed jury instructions to counsel for both parties and gave them the opportunity to comment or object to them. The State had no objections, so the court turned to Jones's counsel.

COURT:      All right. [Counsel], I turn to you on behalf of Mr. Jones. * * *

Any objection to what's contained in the final jury instructions?

DEFENSE COUNSEL: No objection.

COURT: Do you have any requests or additional instructions beyond

what's contained in the final jury instructions as currently constituted?

DEFENSE COUNSEL: No.

Trial Tr. at 958-959.

**{¶ 69}** Jones did not object to the jury instructions as proposed, nor did he ask for an instruction regarding Evid.R. 404(B). Consequently, he has waived all but plain error. We do not find plain error, and the assignment of error is overruled.

### V. Juror Misconduct

**{¶ 70}** In his final assignment of error, Jones argues that the trial court should have done a better job of investigating potential juror misconduct and erred by overruling his motion for a mistrial.

<u>Juror Issue #1</u>

**{¶ 71}** During the second day of trial, a courtroom deputy informed the bailiff that he saw Juror #9 reading a book during witness testimony. After meeting with the bailiff and counsel in chambers, the court decided to examine Juror #9 to determine if the juror really was reading instead of listening to testimony.

**{¶ 72}** Juror #9 first explained that while he did have a book in his hand, he was using it to support his sore back. He initially claimed that he was attentive throughout and that the book was never opened. Juror #9's story then equivocated. After further questioning from the court, Juror #9 took the position that the book was open in his hands, but he was still paying attention.

**{¶ 73}** After the juror was dismissed from chambers, the State immediately expressed concerns about keeping him on the panel. Defense counsel stated that Jones wanted Juror #9 on the panel, and he would not feel comfortable dismissing him without consulting with his client first. The court, for its part, admitted that it was concerned that

Juror #9 had been distracted and that if he had been looking at the book and not the witness, he could not make a credibility determination.

{¶ 74} After the discussion with counsel, the court brought Juror #9 back into chambers for further questioning. His story changed again, and this time Juror #9 admitted that he had been reading, but it was for only a short period of time. After hearing the juror's new revelations, the State moved to remove Juror #9 from the panel. Defense counsel, on the other hand, stated that Jones did not want Juror #9 removed.

{¶ 75} The court ultimately allowed the Juror #9 to stay, finding that his conduct was not of such a nature that it required removal. The court warned Juror #9 of the importance of avoiding distractions and of watching the demeanor of the witnesses to discern credibility. He was provided with a better chair to accommodate his purported back issues and was not permitted to bring the book into the courtroom.

Juror Issue #2

{¶ 76} At the end of the second day of testimony, the bailiff received word from a fellow juror that Juror #9 had been asleep during some of that day's testimony. After being informed of the issue, the State immediately moved for Juror #9's removal, citing the fact that this was his second incident in as many days. Defense counsel again reiterated his client's wish to have Juror #9 remain on the panel.

{¶ 77} Instead of questioning Juror #9 directly this time, the court brought into the chambers the juror who levied the new accusations. The juror stated that he first noticed Juror #9 dozing off during the testimony of one of the officers, telling the court and the attorneys that his head was bobbing and nodding back and forth. "[He] looked like he was, like, halfway awake, and I just wanted to say something, but I was trying to pay

attention too. * * * [E]very time I looked at him, he was * * * just not all the way there." Trial Tr. at 512-513.

{¶ 78} After hearing from the juror, the State restated its wish to have Juror #9 removed. Defense counsel spoke with Jones and once more informed the court that his client did not want Juror #9 removed. The court, invoking a baseball analogy, concluded that this was the juror's second strike, and with a third, he would be out. Juror #9 was not re-questioned by the court but was repositioned to a spot where the court could keep a better eye on him.

Juror issue #3

{¶ 79} On the fourth day of trial, the bailiff explained that a juror, speaking in private, informed her that Juror #9 had been asking evidentiary questions of fellow jurors, causing several of them to discuss what they had heard amongst themselves. The bailiff told the court and attorneys that she went to the jurors to reiterate that there was to be no discussion of the trial until deliberations.

{¶ 80} After hearing the latest accusations against Juror #9, the court gave the parties three options. First, he could bring the jurors back into the courtroom and reiterate, firmly, that there were to be no discussions and that they must put aside any previous discussions. The second option, according to the court, was to call the jurors back – one by one – to determine what they knew of such discussions. The third option was to "deal with" Juror #9 but to "do nothing as it relates to the other jurors." The State opted for a general admonition from the court and (for a third time) moved to remove Juror #9. Defense counsel, after a discussion with Jones, agreed that Juror #9 should be removed and moved for a mistrial based on juror misconduct.

{¶ 81} This time, Juror #9 was excused, and the court gave a hearty curative instruction to the jury stating that there should be no discussions regarding the case – at all – until deliberations. The court overruled Jones's motion for a mistrial, stating the law assumes that the jury will follow the curative instruction.

{¶ 82} Jones now argues that the trial court erred by not further investigating Juror #9 after he was accused of falling asleep during testimony and by failing to hold a hearing to "determine whether bias had been introduced to the jury or whether the impartiality of the jury was compromised." We disagree.

{¶ 83} Under the invited error doctrine, a person is not entitled to take advantage of an error that he or she invited or induced. *State v. Jarrell*, 2017-Ohio-520, 85 N.E.3d 175, ¶ 54 (4th Dist.). This doctrine bars a defendant from making "an affirmative and apparent strategic decision at trial and then complaining on appeal that the result of that decision constitutes reversible error." (Citations omitted.) *Id*.

{¶ 84} In this case, defense counsel, under the explicit direction of Jones, chose to keep Juror #9 on the panel after both the first and second infractions. He cannot now complain that the trial court should have further questioned the juror after he was accused of falling sleep. According to the record, Jones himself made the decision to keep Juror #9 on the jury even after he had reportedly fallen asleep.

{¶ 85} Jones is also responsible for the court's alleged failure to investigate potential juror misconduct after it was revealed that Juror #9 was asking questions of his fellow jurors. The record shows that court laid out three possible courses of action after Juror #9's third infraction:

COURT: All right. Okay. Counsel, there's a couple things I can do. I have

two [sic] paths[.] * * * I can have the jurors come back in with just me and indicate, reiterate that they are not to have any discussions about the case, whatsoever, at this juncture, and to the extent and such conversation occurred, they are to absolutely lay that to the side and pay it no mind. That's one option. I can call the jurors in chambers one by one to determine what they know of any such discussion, what was discussed, how long it was discussed. That's number two. The third option is other than dealing with [Juror #9], to do nothing as it relates to the other jurors.

Trial Tr. at 821-822. The State decided that option one (curative instruction) was the most preferable, and then the court allowed defense counsel to confer with Jones. Upon return, the following exchange occurred:

COURT: But on that issue, number one, do you want me to proceed along those lines?

PROSECUTOR: Yes.

COURT: [Defense Counsel], is that acceptable from the standpoint of Mr. Jones?

DEFENSE COUNSEL: Yes, it is.

Trial Tr. at 831.

{¶ 86} The record indicates that Jones assented to the error he now claims. The trial court gave Jones the option of investigating the jurors individually, but instead he chose a different path: the removal of Juror #9 and a curative instruction. Even if failing to hold a hearing was an error – and we take no position on that issue – it was invited by Jones.

{¶ 87} Jones's fourth assignment of error is overruled.

## VI.    Conclusion

{¶ 88} The assignments of error are overruled.    The judgment of the trial court will be affirmed.

. . . . . . . . . . . .

WELBAUM, J., concurs.

DONOVAN, J., concurs in judgment only.

Copies sent to:

Mathias H. Heck, Jr.
Elizabeth A. Ellis
Matthew M. Suellentrop
Hon. Michael W. Krumholtz